**Charles M. OBERLY, III, Attorney General of the State of Delaware, Plaintiff,**

v.

**HOWARD HUGHES MEDICAL INSTITUTE, a Delaware corporation, Defendant.**

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 15, 1983.

Decided: Jan. 6, 1984.

Bartholomew J. Dalton, Chief Deputy Atty. Gen., and Richard L. Sutton, and Marguerite A. Conan of Morris, Nichols, Arsht & Tunnell, Wilmington, for the Attorney General.

Henry N. Herndon, Jr., Edward M. McNally, and P. Clarkson Collins, Jr., of Morris, James, Hitchens & Williams, Wilmington, and Sherwin J. Markman, Joseph M. Hassett, Jean S. Moore, and Elizabeth B. Heffernan, of Hogan & Hartson, Washington, D.C., for defendant.

BROWN, Chancellor.

This is an action which seeks to determine who is lawfully entitled to be in control of the defendant Howard Hughes Medical Institute, a nonstock charitable corporation formed under the Delaware General Corporation Law. The action was filed jointly in 1978 by the Attorney General and by William H. Lummis, the Delaware Ancillary Administrator of the estate of the late Howard R. Hughes. The original complaint alleged that the certificate of incorporation of the Howard Hughes Medical Institute (referred to hereafter as "the Institute") required that the corporation be managed and controlled by a Trustee, that Howard R. Hughes had been the sole Trustee from the time of the formation of the corporation in 1953 until the time of his death in 1976, and that he had failed to designate a Successor Trustee to succeed himself. The complaint asked the Court to designate a Successor Trustee and it sought to have the co-plaintiff Lummis so named.

Shortly after the suit was filed, the Executive Committee of the Institute as it was then composed, acting under what are claimed to be the existing bylaws of the corporation, amended and restated the certificate of incorporation of the Institute so as to eliminate the position of Trustee, the purpose being to thereby render the Executive Committee the governing body as well as, to the extent required by law, the member of the Institute.[1] Thereafter, the At-

1. In 1953 when the Howard Hughes Medical Institute was first incorporated the Delaware General Corporation Law contained two provisions relating to nonstock corporations which are applicable to this proceeding. At Title 8, *Delaware Code of 1953,* § 102(a)(4) it was stated in part as follows:

"In the case of [nonstock] corporations, the fact that they are not to have authority to issue capital stock shall be stated in the certificate of incorporation. The conditions of membership of such corporations shall likewise be stated in the certificate of incorporation or the certificate may provide that the conditions of membership shall be stated in the bylaws."

And at Title 8, *Delaware Code of 1953,* § 141(e) it was stated as follows:

"The business of every such [nonstock] corporation organized under the provisions of this chapter shall be managed as provided in its certificate of incorporation."

The aforesaid language of § 102(a)(4) has been carried forward as part of the present General Corporation Law in identical form. In contrast, the former language of § 141(e) has been totally eliminated from the present § 141. The statutes pertaining to the management of nonstock corporations are now found at § 141(j) of

torney General and Lummis filed an amended and supplemental complaint seeking also to have the amendments to the certificate declared to be invalid, the basis being that the Executive Committee lacked the power to amend the certificate of incorporation.

Along the way the complaint was dismissed as to Lummis, the grounds being that he lacked standing to maintain such an action since under the rules of contemporary practice only the Attorney General has the exclusive power to bring actions to enforce charitable trusts. *Wier v. Howard Hughes Medical Institute,* Del.Ch., 407 A.2d 1051 (1979). Trial of the matter has now been held between the Attorney General and the Institute, and this represents the decision thereon.

· In a sense, the issue in this case is a simplistic one, but it is one which bodes of substantial consequences. The issue centers around a simple sentence that has existed in the bylaws of the Institute since 1971. It is a sentence composed of a mere 20 words. The primary question to be determined from the evidence presented at trial is whether or not this one simple sentence actually constitutes a part of the bylaws of the Institute. If it does, then control of the corporation is reposed in its Executive Committee and its action in amending the certificate of incorporation was properly taken. If it does not, the action of the Executive Committee in amending the certificate of incorporation under the authority of the bylaws so as to eliminate the position of Trustee is void and, unless the Executive Committee can establish an independent right to have taken such action by statute regardless of the bylaws, then it apparently becomes the unwanted, and perhaps undesirable, duty of this Court to appoint a Successor Trustee or Trustees to govern the affairs of the corporation.

This simple issue for decision is largely a question of fact, or, perhaps better stated, a question of the inferences to be drawn from what, in the main, are the undisputed facts. It is a decision that must be drawn from circumstantial evidence measured in the light of certain evidentiary and substantive law presumptions. The matter is made difficult by virtue of the fact that death and serious illness have rendered certain key players in the controversy unavailable. Moreover, the case has been presented for decision on the basis of a paper record consisting solely of numerous exhibits and extensive deposition testimony. Thus, to the extent that the credibility of witnesses is a factor, the inability of the Court to actually hear their testimony and to view their demeanor works an added disadvantage.

In short, it would be difficult to perceive of a matter of such far-reaching ramifications as this being presented in a less desirable format from the standpoint of the Court as the trier of the facts. However, having no choice, I approach the task as I find it. The bylaw sentence in issue will be set forth hereafter as it appears in the chronology of events.

## I

Some background is necessary in order to place the controversy in proper perspective. It would be unlikely to believe that anyone in contemporary business and legal communities has not heard of the name of Howard R. Hughes. He was a man of vast wealth and business enterprise, not to mention eccentricity and intrigue. In 1953 Howard Hughes established and funded the Howard Hughes Medical Institute. It was formed as a tax-exempt, nonprofit, nonstock Delaware corporation. The purpose of this corporation, at least according to its charter, was and is "the promotion of human knowledge within the field of the basic sciences (principally the field of medical research

the present Title 8. Counsel agree, however, that although the form of the former § 141(e) has been changed under the present law, its substance has not, and that one still must look

to the certificate of incorporation of a nonstock company in order to ascertain the manner in which it is to be managed.

and medical education) and the effective application thereof for the benefit of mankind."

In 1953, in order to fund the Institute, the electronics division of Hughes Tool Company, a corporation then solely owned by Howard Hughes, was spun off and formed into a new corporation known as Hughes Aircraft Company. In effect, Hughes personally donated all of the stock of Hughes Aircraft Company to the Institute. In the process of this transaction, the Institute became the sole owner of all of the outstanding common stock of Hughes Aircraft Company. The Institute has maintained this position of sole ownership of Hughes Aircraft Company (hereafter "Hughes Aircraft") from 1953 to the present. This investment continues to be the sole source of funding for the Institute's work.

Over the years since 1953 Hughes Aircraft is said to have developed into one of the United States most important and valuable aerospace and defense companies. According to its 1982 annual report to its employees (it apparently makes no formal report to shareholders since it has only the one), Hughes Aircraft had during that year some 64,300 employees, had sales of $4.4 billion, had new orders of some $7.9 billion and an order backlog of $11.2 billion. Since the Institute is the sole owner of Hughes Aircraft, the control of the Institute is equivalent to the control of Hughes Aircraft. Thus does the decision in this case take on a certain amount of significance.

The decision is also significant from the standpoint of the Institute itself. The work of the Institute is in the area of medical research, with the current focus being in the fields of genetics, immunology, and metabolic regulation. This work is done largely in association with and at the facilities of teaching hospitals at various universities, including, among others, those at Harvard University, Johns Hopkins University, Duke, Yale, Vanderbilt, Stanford, Baylor and the University of California. Research work is performed through medical

and scientific "investigators" approved and retained on a periodic or project basis under the supervision of a corporate Medical Advisory Board. Under this format the Institute expended some $39 million on medical research during 1982.

In practice, at least so far, the judgments of the Medical Advisory Board of the Institute and the judgments of the management of Hughes Aircraft regarding the affairs of that company have been accepted by the Executive Committee of the Institute. Of course, since there is no guarantee that this will continue, the question of who is in control of the Institute and who will have the power to designate successors or additions to its governing body is one of vital importance. Having set forth that which is at stake, I turn to the relevant facts of the matter.

II

Article "Fifth" of the original certificate of incorporation of the Institute reads as follows:

"The corporation shall have no capital stock and shall be managed and controlled by a Trustee. The Trustee may, at any time and from time to time, delegate any responsibility and authority to such persons as he may select, in accordance with such by-laws or resolutions as the Trustee may adopt."

Article "Eighth" of the certificate required the incorporators to promptly name the original Trustee and thereafter it stated as follows:

"Successor Trustees shall be named by the original Trustee or in such manner as the original Trustee may designate."

Hughes was designated as the original Trustee by the incorporators as of the date of incorporation and on the same date Hughes, as the sole Trustee, adopted a resolution which read in applicable part as follows:

"RESOLVED, that there is hereby created a committee to be known as the Executive Committee of the corporation,

which Committee shall have and exercise such powers, duties and authorities as the Trustee may from time to time designate."

The resolution went on to provide that the Trustee could appoint the members of the Executive Committee, increase or decrease its size, remove members without cause, and abolish the Executive Committee at any time.

All of the foregoing took place on December 17, 1953. Hughes originally designated himself as a member of the Executive Committee and thereafter, for a prolonged period of time he served of record in that capacity along with either one or two other members also designated by him. However, with the single exception of an inconsequential resolution adopted in 1955, there is not a single entry in the minute book of the Institute for the period from 1953 to 1968. In essence, the work of the Institute over these years was carried on by its Medical Advisory Board.

In 1968 attorney Raymond A. Cook, a member of the Houston, Texas law firm of Andrews, Kurth, Campbell & Jones which at the time represented Hughes and certain of his interests, recommended to Hughes that he activate the role of the Executive Committee. Accordingly, by resolution dated July 3, 1968 Hughes appointed a new Executive Committee composed of Cook, James A. Drury, Cook's law partner at the Andrews, Kurth firm, and Raymond M. Holliday, a longtime employee of Hughes who went on to become executive vice president, and later chairman of the board, of Hughes Tool Company. That resolution by Hughes, as Trustee, concluded as follows:

"RESOLVED, that except as may be otherwise provided in the Certificate of Incorporation or in further resolutions of the Trustee, there is hereby delegated to the Executive Committee all of the duties and powers to manage the affairs of the corporation which Delaware law has conferred upon the boards of directors of corporations organized for profit."

Despite this reorganization of the Executive Committee, however, and despite the fact that over the years Hughes rarely exercised his power as Trustee (he was also the president of the Institute from 1953 until his death in 1976 although he never took any action as such) it was common knowledge among the members of Hughes's organization that he insisted on retaining absolute control over the affairs of the Institute. Moreover, he had at times indicated to certain of his close employees that it was his intention ultimately to leave his entire estate to the Institute by will upon his death.

Knowledge of this hinted intention on his part as well as other factors caused a constant concern among Hughes's advisors over the years from 1956 to 1968 with regard to the naming of a Successor Trustee by Hughes. It was difficult to get Hughes to do anything, and despite suggestions and recommendations from those around him, he took no apparent action with regard to providing for a Successor Trustee to take over the control of the Institute after his death. It was thought by some that in view of his testamentary leanings he might designate a successor in his will. Given Hughes's idiosyncrasies and the ever increasing secrecy of his life style, however, no one could be sure of this.

In this setting, in or about August, 1968, Raymond Cook, as a member of the Executive Committee, undertook to draft a set of bylaws for the Institute. Prior to that time there were none. By a resolution dated August 30, 1968 the Executive Committee, as thus composed of Cook, Drury and Holliday, adopted a set of bylaws for the corporation. Included in these bylaws was a sentence drafted by Cook (hereafter "the Cook sentence") which read as follows:

"If the original Trustee shall fail to name successor Trustees or to designate the manner in which they are to be selected, then the Executive Committee shall name the successor Trustees."

This was basically in keeping with Cook's belief, as expressed to the Medical Advisory

Board as far back as 1956, that if anything happened to Hughes before he named a Successor Trustee, the Executive Committee would "probably" be empowered to appoint itself as a board of trustees. Significantly, however, the Executive Committee did not advise Hughes that it had taken it upon itself to adopt this set of bylaws nor was Hughes made aware of the existence of the Cook sentence in the bylaws. In short, this action by the Executive Committee was taken without his knowledge.

The effect of the Cook sentence was to place Cook, along with the other Executive Committee members, in a position to be in control of the Institute upon Hughes's death. This possibility greatly concerned one Robert Maheu, a key officer who ran Hughes's Las Vegas casino operations at the time and who did not want to become subject to Cook's control upon the death of Hughes. In early 1969 Maheu caused Hughes to be made aware of the existence of the bylaws and the Cook sentence.

Hughes was outraged by the Cook sentence and referred to the action of Cook and the Executive Committee as an "obvious misuse of authority." Hughes sought advice on the situation from Chester C. Davis, a New York attorney who was also representing certain Hughes's interests at the time. He indicated to Davis his intention to dissolve the Executive Committee and to have the bylaws revoked.

Davis responded by advising Hughes that in his opinion only Hughes, as sole Trustee, could adopt bylaws for the Institute and he indicated that since Hughes had not done so, the bylaws adopted by the Executive Committee were probably of no effect. However, Davis was then representing Hughes's interests in ongoing hearings before the Civil Aeronautics Board and since the existence of bylaws for the Institute was of some significance to those hearings, particularly with regard to the future control of the Institute, Davis implored Hughes to take no action until the hearings had been completed.

Hughes apparently acquiesced in this and nothing further happened until May of 1970. At that point the matter erupted with a vengence. Raymond Holliday, who was then in Belfast, Ireland, received a communication from Hughes to return at once to the United States, to cause the bylaws to be revoked and to immediately obtain the resignations of Cook and Drury from the Executive Committee. In Holliday's words, the "message came through loud and clear" that Hughes had "just blown a fuse" and that "he was terribly angered by the fact, that a provision had been put in the bylaws saying that the Executive Committee could, if he failed to act, name a successor trustee."

On his way back to Houston, Holliday stopped in New York to discuss the problem with Chester Davis. Davis was aware of the situation and confirmed to Holliday that "the old man was on the warpath" and that he was "extremely upset" about the Cook sentence.

Holliday proceeded on to Houston and carried out his assignment. By resolution of May 20, 1970 the Executive Committee revoked the adoption of the existing bylaws and directed that Holliday draft a revised set of bylaws to be submitted to the Trustee for his approval. As instructed, Cook and Drury thereupon resigned from the Executive Committee "due to the pressure of other matters." Hughes was adamant thereafter that Cook have nothing more to do with the Institute.

Against this backdrop we come to the preparation of the bylaws in issue in this case and events surrounding the eventual adoption, or purported adoption of some or all of them by Hughes during 1971. Before proceeding further, however, it is absolutely essential to an understanding of the problems in this case to digress briefly for the purpose of considering the particular life style and manner of doing business employed by Howard Hughes during the year 1971 and the years immediately prior thereto as reflected by the evidence presented.

### III

For several years preceding the events in issue in this case, Howard Hughes had undertaken to isolate himself from the world around him. His office became wherever he was living at any given time. His personal needs were attended by a group of five to six men who were known as his "aides." Direct communication with Hughes was virtually impossible. All messages to Hughes as well as his responses thereto were delivered through these aides. At least one of these aides was in attendance with Hughes on a 24-hour basis, it apparently being the practice to have three aides working eight-hour shifts around the clock during which time the others would be off duty awaiting their turn. This was necessitated by the propensity of Hughes to work any hour of the day or night depending upon his particular mood or whim.

Within his organization, the place where Hughes was living and made his office at any particular time was known as "location." In Los Angeles an office was maintained by a staff which, among other things, handled messages to and from Hughes. This Los Angeles office acted more or less as a communications center for the Hughes organization for the purpose of transmitting and receiving messages from location. This office was known within the organization as "operations."

In general practice, then, if persons desired to communicate with Hughes for the purpose of seeking his approval, direction or reaction to any particular subject or proposal, the message was first sent to operations. Operations would then send the message to location where it would be received by an aide. The aide would then deliver it to Hughes. At some point thereafter an aide, be it the same or a different one, would send Hughes's response back to operations where, in turn, operations would convey the response to the person who had initiated the communication. Similarly, communications initiated by Hughes were delivered in this same manner.

Certain key persons in the Hughes organization, such as Raymond Holliday, Chester Davis, Frank William Gay, another long-time trusted employee of Hughes who eventually was appointed by Hughes as a member of the Executive Committee of the Institute, and Nadine Henley, described as Hughes's personal secretary from the late 1940's onward until the time of his death as well as his personal representative who regularly attended Institute meetings on his behalf, would at times contact location directly. Still, however, despite the key positions that these persons held with regard to Hughes and his business interests, their messages and communications were nonetheless funneled through the aides.

The extent to which Howard Hughes isolated himself from even those persons on whom he most depended in his vast business dealings is perhaps best illustrated by the fact that neither Holliday nor Henley, his personal secretary, saw Hughes in person subsequent to 1961. Bill Gay saw him only once thereafter, that being in London in 1973. Davis, who became his chief counsel, first saw him in 1971 but only in passing and then without conversation. He saw him again in London in 1973 and across one or two rooms in Freeport in the Bahamas in 1974 and 1975. Neither Henley nor Gay spoke to Hughes directly by telephone after 1970. Holliday and Davis had only a few telephone conversations with Hughes directly after 1970. In the main they, like everyone else, went through the aides.

Moreover, the vast majority of the communications delivered to and from Hughes through the aides were oral. Occasionally a written message would be telecopied or hand delivered to the aides, and sometimes, depending upon the nature of the matter, an aide would be asked to write down the message and read it back to the sender so as to assure its accuracy before its delivery to Hughes. Generally, however, the response coming back from the aide was oral—simply a statement to the effect that "Howard says" that it was all right or not all right to do something, etc. In this fash-

ion, without any documentation, were the many business decisions within the Hughes organization made and the expenditure and commitment of millions of dollars authorized over the years. The significance of Hughes conducting his affairs in this manner will appear hereafter.

## IV

Returning to the sequence of events, the action taken by Holliday at Hughes's direction and the resulting resolution of the Executive Committee of May 20, 1970 left the Institute without bylaws. This became an immediate problem in view of new federal Treasury regulations which were about to go into effect and which would require a charitable organization such as the Institute to make some provision within its internal structure to assure that all contributions received by it were distributed within five years of receipt in order to maintain its tax-exempt status. With this concern in mind, and at Holliday's request, Seymour S. Mintz, a partner in the Washington, D.C. law firm of Hogan & Hartson (that firm had also been representing certain of Hughes's interests for some time) undertook to draft a new set of bylaws which, among other things, would include a provision to satisfy the requirements of the Treasury regulation.

In so doing, Mintz was very much aware of the adverse reaction of Hughes to the Cook sentence that had been included in the 1968 bylaws. Thus, in the process of drafting new bylaws, Mintz took the 1968 bylaws, added a provision relating to the Treasury regulation requirement and eliminated therefrom not only the Cook sentence but also all other provisions which, in his view, could be looked upon in any way by Hughes as a possible encroachment by the Executive Committee on his absolute control over the Institute as Trustee. On December 4, 1970 Mintz forwarded a set of these new bylaws to Raymond Holliday along with a cover letter explaining what he had done.

Thereafter, Holliday sent Hughes a memorandum dated December 23, 1970 (it was also read over the telephone by Holliday's secretary to location on that same date) advising him that Mintz had prepared a new set of bylaws and that it was "highly important" that Hughes give his assent to these bylaws in order that Mintz could advise the Internal Revenue Service that the requirement of the new Treasury regulation had been met. Holliday also pointed out that in drafting the new bylaws Mintz had deleted "the provisions of the previous set which you found objectionable." Through one of his aides Hughes thereafter requested a set of the new bylaws and a copy was apparently forwarded on to location. (By this time, "location" had shifted to a hotel in the Bahamas.) This was followed by a customary period of inaction on the part of Hughes.

Eventually, on or about February 4, 1971 Hughes, through an aide, requested that Chester Davis review the bylaws submitted by Holliday and Mintz. Davis, who had been provided with a copy of the proposed bylaws, responded by a written three-page memorandum to Hughes dated February 5, 1971. In that memorandum Davis pointed out, among other things, that Mintz had deleted in its entirety the Cook sentence that would have permitted the Executive Committee of the Institute to appoint Successor Trustees in the event that Hughes failed to act to do so. Rather than leave the bylaws blank on this subject, however, Davis suggested that language identical to that contained in the certificate of incorporation, namely, that "[s]uccessor Trustees shall be named by the original Trustee or in such manner as the original Trustee may designate," should be included as a separate provision of the bylaws. Davis went on to state in this memorandum as follows:

"In connection with the above, you should bear in mind that if you do not designate a successor Trustee or the manner in which a successor Trustee is to be selected by an appropriate writing, the designation of such Trustee or the manner of selecting one will probably have to

be determined by the Delaware courts. At the moment I do not know exactly what procedures would be followed since there appears to be no statutory provisions specifically applicable. Therefore, I strongly recommend that you do not allow such a situation to arise."

There is substantial doubt that Hughes ever reviewed either the proposed bylaws or the February 5 memorandum of Davis. Another quirk of his at the time was that in general he refused to look at any memo submitted to him in writing if it exceeded one page. He required memos from his employees and advisors to be reduced to one page and he preferred that each memo deal only with one subject matter. Accordingly, on February 11, 1971 a secretary to Davis received word from Nadine Henley who in turn had received it from an aide that Hughes did not want to read all the bylaws and the memorandum of Davis. Rather, he wanted a summary from Davis. By a memorandum dated February 20, 1971 Davis responded in one-page fashion. This time, on the subject of a Successor Trustee, he said only that he concurred with the proposed bylaws to the extent that they deleted the power of the Executive Committee and to the extent that they specified that "only the Trustee" had the power to name a Successor Trustee. (Of course, the bylaws drafted by Mintz contained no such specification since they omitted any reference to the subject at all.)

In the meantime, Holliday, Davis and Henley in particular had been sending messages for Hughes urging that he fill the two vacancies on the Executive Committee occasioned by the resignations of Cook and Drury on May 20, 1970. Accordingly, by resolution dated February 21, 1971 Hughes designated Davis and Bill Gay to serve as members of the Executive Committee along with Holliday.

Also, from December 1970 through February 1971 Holliday and Mintz had been persistently sending messages through the aides in an effort to have Hughes adopt the bylaws. The time was growing short with regard to the Internal Revenue Service and the continued tax-exempt status of the Institute. On March 16, 1971 Holliday and Mintz sent a joint message for Hughes in which they stated that it was "essential that the HHMI [the Institute] By-laws be approved at once so that we can get our IRS ruling application in Washington moving again immediately." They concluded their message with the words "[p]lease advise that you have approved the By-laws."

Thereafter, we come to four documented events which form the core of the issue to be decided.

## V

First, under date of March 18, 1971 Hughes, as Trustee, executed a resolution on behalf of the Institute, which reads as follows:

"RESOLVED that the bylaws *annexed hereto* are adopted as the bylaws of the Corporation and shall be and constitute the bylaws of the said Howard Hughes Medical Institute." (Emphasis added.)

It is undisputed that as of that date, March 18, 1971, the bylaws prepared by Mintz and forwarded to Hughes by Holliday did not contain within them the sentence that is challenged by the Attorney General in this action. It is also quite likely that any draft of the bylaws that may have existed on that date had not been retyped to include certain minor changes recommended by Davis in his three-page memorandum of February 5. Moreover, a rarely-found, handwritten note of Hughes to himself, bearing a stamped date of March 18, 1971, makes what appears to be a reference to a paragraph in the one-page Davis memorandum of February 20, 1971 and concludes with the words "I think the language should be revised to conform to the fact that the committee now includes 3." Thus, it would appear that on the very date that Hughes signed a resolution adopting the bylaws "annexed hereto" he was indicating his thought that the language of the bylaws should be revised to some degree.

While there does not appear to be any direct evidence as to how or when it came about, it seems that the original of this signed resolution of March 18 was forwarded on to Nadine Henley at her office at operations along with some instruction to prepare the bylaws in final form. This is evidenced by the next document in sequence.

By a memorandum of April 2, 1971 Nadine Henley wrote to Chester Davis as follows:

"Attached is a copy of the final draft of the HHMI By-laws. *If it meets with your approval, will you kindly notify Seymour Mintz or Raymond Holliday that it is approved* and advise me so I can mail *the original with the signed Resolution* to Raymond Holliday (who has the minute book). Attached are the original by-laws, upon which there is superimposed Mr. Mintz's changes and your memo of February 5 setting forth your changes, as well as your memo of generalizations of February 20."

After indicating that she had personally proof-read the bylaws for accuracy and after making comment about certain of their provisions, Henley concluded her memorandum to Davis as follows:

"*If you approve* these by-laws, please advise in what manner they should be affixed to the signed Resolution by the Trustee for transmittal to Raymond Holliday." (Emphasis added.)

Thus, it would appear that on April 2, 1971 Henley had in her possession the original of the March 18 resolution signed by Hughes as well as what she then concluded to be the bylaws in the final form in which they were to be adopted. It seems equally clear, however, that she was awaiting some final word of approval from Davis before she released these documents from her custody for the purpose of having them placed in the minute book as the new bylaws of the Institute. It is also undisputed that on this date the sentence being challenged by the Attorney General in this action was not included in the draft of the bylaws possessed by Henley.

Davis responded to Henley's memo with what is the third document in the sequence. Under date of April 5, 1971 Davis sent another one-page memorandum to Hughes. In its entirety this memorandum reads as follows:

"1. I understand that you may not have read my memo of Feb. 5 on this subject and since then you have added Davis and Gay to the Executive Committee. Before releasing the By-laws it is important to us that you evaluate one provision and the problem associated with it.

"2. We must anticipate that upon the filing of the By-laws with IRS we will be asked what, if anything, you have done or propose to do to designate a successor trustee. You will recall that this specific question was asked during the CAB Air West hearings. In order to avoid the necessity of answering such a question and also to solve the problem raised in my memo of Feb. 5 relating to the legal situation which would arise if you do not designate a successor trustee or the manner in which a successor trustee is to be selected, and since we specifically eliminated a provision of the By-laws empowering the Executive Committee to name a successor trustee if you do not do so, I recommend that there be added to Article III, Section 1, an additional sentence reading as follows:

'*In the absence of a Trustee, the Executive Committee shall also have and may exercise the powers of the Trustee.*'

"3. Such a provision would not empower the Executive Committee to name a successor trustee but it would permit a form of continuity by the Executive Committee to manage the affairs of the Corporation without undesirably involving a determination by the Delaware courts as to how the successor trustee is to be selected." (Emphasis added.)

Thus was there born the sentence in controversy in this suit—referred to hereafter as the "in the absence of" sentence. It was composed and created by Chester Davis in his memorandum to Hughes of April 5, 1971.

Following this memo and recommendation by Davis, the evidentiary record with regard to the bylaws becomes strangely empty. It does appear that on April 2, 1971 Mintz received some telephonic word from Holliday that the bylaws had been approved and had been hand delivered to Los Angeles. Further, in a memo to his file dated April 6, 1971, Mintz wrote as follows:

"I received a call from Chester Davis this afternoon.

"*He has received the HHMI bylaws signed by HRH on March 18, 1971.* They contain the language for the new tax regulations, and Chester Davis authorized me to so state to IRS. He will send me a copy eventually. *He is trying to get HRH to add a sentence giving Executive Committee right to exercise powers of trustee when there is no trustee.*" (Emphasis added.)

It also appears that at some point prior to May 15, 1971 William Rankin, then the controller for the Institute and the person responsible for the preparation of its tax return, contacted both Holliday and Henley in an effort to obtain a copy of the bylaws to be included with the filing of the tax return. He was told by Holliday that the bylaws were "not available" and by Henley that they were not yet "ready for release." Finally, more than three months after Davis's April 5 memo to Hughes, there appears the fourth critical document.

By letter dated July 16, 1971 Nadine Henley wrote to Holliday, with a copy to Davis and Gay, as follows:

"Attached is the signed Resolution of the Trustee of Howard Hughes Medical Institute, adopting the By-laws of the Corporation, *dated March 18, 1971,* to which is attached the By-laws consisting of 13 pages." (Emphasis added.)

The copy of the bylaws attached to her letter by Henley contained for the first time the "in the absence of" sentence. It appears as the last sentence to Article III, Section 1, as suggested by Davis in his memorandum of April 5.

## VI

Upon receipt of Henley's letter Holliday (he then held the office of Secretary of the Institute) caused the March 18 resolution and the copy of the bylaws containing the "in the absence of" sentence to be included and made a part of the minute book of the corporation. They have been regularly maintained there ever since. A copy of the bylaws with the "in the absence of" sentence found their way into the files of the Andrews, Kurth law firm and in 1974 a member of that firm joined with Davis and Mintz in sending a memorandum to Hughes concerning, among other things, the control he had under the corporate charter and the bylaws.

In November 1971 Rankin, as controller, filed a copy of the bylaws of the Institute with the Internal Revenue Service along with a copy of the corporate tax return. In so doing, he certified to their accuracy as the bylaws of the corporation. These bylaws contained the "in the absence of" sentence.

In 1973, in proceedings before the Committee on Banking and Currency of the United States House of Representatives, a follow-up submission made on behalf of the Institute in response to an inquiry of the Committee stated in part as follows:

"The Bylaws adopted by Mr. Hughes as original Trustee provide that in the absence of a Trustee the Executive Committee shall also have and may exercise the powers of the Trustee."

Howard Hughes died on April 5, 1976 while on an airplane flight from Mexico City to Houston. He thus lived and continued to serve in his capacity as sole Trustee for the Institute for a period of almost five years following Henley's July 16, 1971 letter to Holliday and the consequent inclusion

by Holliday in the minute book of the corporation of the bylaws containing the "in the absence of" sentence. During that period there is no evidence of Hughes having any comment or reaction one way or the other as to the existence of the "in the absence of" sentence in the bylaws. The sentence did, however, openly constitute a part of the corporate records, and thus a part of the bylaws purportedly adopted by him, for a period of almost five years prior to his death.

### VII

Despite these factors last indicated, it is the position of the Attorney General that there is no proof that Howard Hughes, as sole Trustee, ever approved or adopted the "in the absence of" sentence recommended by Davis. And on this point the Attorney General is quite correct, at least insofar as any direct evidence is concerned.

It is to be remembered that the only document executed by Hughes for the purpose of approving the 1971 bylaws was the resolution of March 18, 1971. It is to be noted also that this same resolution is the document included in the minute book and relied upon by the Institute as constituting the act of Hughes in adopting the bylaws containing the "in the absence of" sentence. Yet it is the unassailable fact that the sentence was not included in any set of bylaws existing on March 18, 1971 and that it did not come into existence until drafted by Davis in his subsequent memo to Hughes of April 5.

Thus, the Attorney General argues that it was necessary for Hughes to have taken some action subsequent to April 5 indicating his decision to adopt the critical sentence since only he had the power to adopt

bylaws for the corporation. Since there is no proof of any such action on the part of Hughes, and nothing to indicate even an inclination on his part to do so, it is the position of the Attorney General that legally the "in the absence of" sentence has never formed a part of the bylaws of the corporation. Thus, the Attorney General contends that the Executive Committee never became possessed of any authority upon the death of Hughes to exercise the powers theretofore reposed solely in the Trustee by the certificate of incorporation of the Institute. Accordingly, the Attorney General argues that the Executive Committee, as then composed in 1978 of Davis, Gay and Dr. George W. Thorn,[2] possessed no power to amend the certificate of incorporation so as to eliminate the position of Trustee and thereby render itself as the sole remaining governing body of the Institute.

Based upon the foregoing rationale, the Attorney General asks the Court to find that the act of the Executive Committee in purporting to amend the certificate of incorporation in 1978 was void and to find further that the original language of Article "Eighth" of the certificate requiring Successor Trustees to be named by the original Trustee remains a part of the certificate. Since Hughes has died without making provision for anyone to succeed him as Trustee, and in view of the nonprofit charitable purpose of the Institute, the Attorney General asks that this Court use its equitable powers to intercede on behalf of the public interests involved and to name a Successor Trustee or Trustees to manage and control the affairs of the Institute.

**2.** Raymond Holliday resigned as a member of the Executive Committee on February 24, 1974. On the same date he resigned as corporate secretary as well. This was due to the fact that in 1972 Hughes Tool Company had been spun off as a public company and Holliday, electing to stay on with that company, felt it advisable to sever his relationship with the Institute. Hughes did not replace him. On July 9, 1978, Davis and Gay, as the remaining members of the Executive Committee appointed by Hughes, and acting under the authority of the "in the absence of" sentence, made George W. Thorn the third member of the Executive Committee. Dr. Thorn had been the Director of Research for the Institute from 1956 to 1978. He thereafter served as Chairman of the Medical Advisory Board of the Institute from 1978 to 1982. Gay and Dr. Thorn presently constitute the Executive Committee.

## VIII

In addition to the lack of any direct evidence that Hughes ever specifically adopted the "in the absence of" sentence as part of the 1971 bylaws of the Institute, the Attorney General also relies upon circumstantial evidence which would tend to support the inference that he did not do so. As noted previously, for the period between April 5, 1971, the date of Davis's memorandum recommending adoption of the sentence in issue, and July 16, 1971, the date of Henley's letter forwarding the bylaws with the sentence embodied therein, the evidentiary record is completely devoid of anything that would indicate that Hughes had decided to act favorably on the recommendation. I agree with the Attorney General that under the circumstances this is remarkably strange.

Before proceeding to analyze briefly the factors that go to make up this status of events, I think it appropriate to note that aside from Hughes himself the two key persons whose testimony would be the most vital to this issue would be Chester Davis and Nadine Henley. Sadly enough, Chester Davis died several weeks before the scheduled trial of this matter and Nadine Henley has suffered a stroke which has left her unable to speak. Thus the Court is left with only the deposition testimony given by them in 1978 and 1979 respectively.

The deposition testimony of Nadine Henley is particularly significant from the standpoint of what she cannot recall. Specifically, she has no recollection of who informed her that Hughes had approved of the set of bylaws which contained the "in the absence of" sentence. At the same time, she states unequivocally that she must have been so informed by someone, for otherwise she would not have sent her July 16, 1971 letter to Holliday, with a copy to Davis and Gay, accompanied by a set of the bylaws which contained the sentence. She states in effect that over her many years as personal secretary to Hughes it was her practice never to send out any communication indicating that he had taken action on a matter unless she had been informed by someone in a proper position of authority that he had done so. Therefore, she reasons that she would not have sent the letter to Holliday in this instance in the absence of having been assured that Hughes had given his approval. She states that she would never have taken such action on her own. In other words, she cannot recall but can only assume based upon her customary practice.

This lack of recollection on Henley's part is strange for several reasons. For one thing all agree that Henley was a meticulous person who was given to detail. Her recollection of many things connected with Hughes's endeavors over the years was excellent. She herself acknowledged that within the Hughes organization her meticulous nature caused her to be known as "Madam Nit-pick."

Secondly, her special interest within the Hughes empire had been the Institute since the time of its formation in 1953. She regularly attended meetings of the Institute and its Medical Advisory Board as the personal representative of Hughes, the Trustee. She was involved in its workings and was well aware of the critical need for Hughes to make some provision for his successor or successors upon his death.

Thirdly, she was aware of the reaction of Hughes with regard to the Cook sentence that had been included in the 1968 bylaws, and she was well aware of the ongoing efforts of Holliday and Mintz from December 1970 through April of 1971 to have Hughes act to adopt a set of bylaws. She became possessed of the original of the March 18 resolution actually signed by Hughes and she was, in effect, sitting on a set of bylaws from April through July awaiting some word as to when they could be released for inclusion in the minute book.

Given her efficient and meticulous nature, her longtime loyalty to Hughes and her knowledge of the circumstances surrounding the ongoing effort to have Hughes adopt a set of bylaws and to make some provision for a Successor Trustee for

the Institute in which she was so interested personally, it seems inconceivable that when finally the word allegedly came from Hughes after a three-month wait she could have no recollection whatever as to how she was so advised or by whom. Given the significance of the "in the absence of" sentence, which represented the accomplishment of something which, despite prior efforts, no one had been able to get Hughes to do for years, namely make provision for his successorship as Trustee, it is difficult to believe that no one within his organization has any recollection as to how his approval of the critical addition to the bylaws was communicated or by whom. Yet this is the status of the evidence. One obvious inference from this, of course, is that no word of approval of the "in the absence of" sentence ever came from Hughes between April 5, 1971 and July 16, 1971.

Chester Davis has testified in his deposition that he never received any response to his April 5 memorandum to Hughes and, further, that his first knowledge that Hughes had accepted his recommendation and had included the "in the absence of" sentence in the bylaws came when he received his copy of Henley's letter of July 16. Thus, Hughes did not communicate his approval of the sentence through Davis. Likewise, Holliday and Gay, the other members of the Executive Committee at the time, indicate that in all probability the first word received by them on the subject came from Henley. Mintz, the draftsman of the bylaws that were originally submitted to Hughes for approval, did not learn of the inclusion of the sentence in the final draft of the bylaws until many months later. Thus, no word of approval from Hughes was passed on to Henley through them.

Accordingly, the testimony of Henley on the subject takes on critical significance. Because of this I set it forth hereafter, keeping in mind that according to the language of her memo to Davis of April 2, 1971 she apparently was seeking approval at that time from Davis, not Hughes. Her testimony concerning her sending of the July 16 letter, with certain portions emphasized, is as follows:

"Q. (By Mr. Markman) Do you remember if there came a time when you learned that Mr. Hughes had approved bylaws in 1971?

"A. Yes. I don't remember when I was told that, but *obviously I was,* because I sent [by the July letter] the completed ones to Mr. Holliday for the minute book.

"Q. Do you remember from whom you learned that Mr. Hughes had approved the bylaws?

"A. *I wish I did, but I don't.*

\* \* \* \* \* \*

"Q. (By Mr. Markman) I believe I asked before if you believed when you sent [the July letter] that the bylaws had been approved by Mr. Hughes, the bylaws which are part of that exhibit.

"A. I am sure I did.

"Q. And *what was the source of your belief* to that effect?

"A. *That I do not know.*

"Q. Do you have any recollection as to the source of that belief?

"A. I am sorry *I do not.*

"Q. (By Mr. Markman) *Do you recall who asked you to send* [the July letter] *to Mr. Holliday with copies to Mr. Gay and Mr. Davis copies of these bylaws?*

"A. *I would assume that Mr. Davis did.*

"Q. Do you have any recollection that Mr. Davis did?

"A. No sir.

\* \* \* \* \* \*

"Q. (By Mr. Markman) Is it your recollection that Mr. Hughes had taken months to decide upon the bylaws finally?

"A. That is an *assumption* I made.

\* \* \* \* \* \*

"Q. (By Mr. Markman) *Did there come a time when you were informed that Mr. Hughes had approved the bylaws with [the 'in the absence of' sentence] in it?*

"A. *I do not specifically remember that, no sir.*

"Q. Do you remember generally?

"A. *I am sure I must have been told that or I would not have sent it to Holliday that way.*

\* \* \* \* \* \*

"Q. (By Mr. Markman) Do you have a recollection, as vague as it may be, that the problem with the bylaws was ultimately solved?

"A. Well, it obviously was, because we put them into effect. I mean, *I sent them to Holliday and put them into effect in July.*

"Q. You would not have done that unless someone who you believed knew what Mr. Hughes had authorized and told you he had authorized it; is that correct?

"A. That's correct. That's correct.

\* \* \* \* \* \*

"Q. (By Mr. Markman) *At some point prior to your sending out your letter in July 1971, do you recall being informed by somebody that the bylaws had been approved* by Mr. Hughes?

"A. *No, but I would have had to have sent that letter.*

"Q. And that would be by somebody who was *in a position to know* Mr. Hughes' directions; is that correct?

"A. Yes. *Chester or Holliday.*

"Q. *Or one of the aides?*

"A. *I would think the way he was working this with Chester that it would have been Chester or Holliday.*

"Q. Do you have a recollection, or are you trying to reconstruct?

"A. No. I am trying to reconstruct.

"Q. So with the reconstruction, could it also have been one of the aides, Lavar, or one of the others?

"MR. SUTTON: I think Miss Henley answered that question.

"Q. (By Mr. Markman) You may answer the question. You suggested in reconstructing it that it could have been Mr. Holliday or Mr. Davis.

"A. Yes.

"Q. Could it have also been one of the aides?

"A. Yes, I would think it could have been.

\* \* \* \* \* \*

"Q. (By Mr. Markman) Do you have any recollection of having discussed that language [the 'in the absence of' sentence] with anyone or that problem?

"A. I may have, but *I have no recollection of discussing it with anyone. I think I accepted it as something he wanted, and that was that.*

\* \* \* \* \* \*

"Q. (By Mr. Sutton) Although you have no memory you believe that you would not have mailed the July letter including the final bylaws had you not been told—

"A. I am sure I would not have.

"Q. —that Mr.—

"A. *That is exactly what I am saying.*

"Q. —that Mr. Davis had notified Mr. Holliday that it was approved?

"A. *Or me.*

\* \* \* \* \* \*

"Q. (By Mr. Sutton) Now, I understand your testimony to be that you have no memory of anyone ever telling you after this memo of April 2 that Mr. Hughes had approved the addition to the bylaws of the language "In the absence of a trustee the executive committee shall have and may exercise the powers of the trustee." Is that correct?

"A. *I have no memory of anyone advising me that Mr. Hughes had,* but if our *chief counsel* [Davis] advised me that they were ready to send, I am sure *I would assume that he had the understanding and the authority to do it.*

"Q. But you have no memory of anyone, either Mr. Davis or anyone else, ever telling you that Mr. Hughes approved of that addition?

"A. No."

It is to be noted that during the course of this testimony the effort was made to have Henley agree that she could have possibly received word of Hughes's approval of the

"in the absence of" sentence through one of the aides. She did agree that this could have happened despite her tendency to think that word probably came to her through either Davis or Holliday. In this regard I take note, as the Attorney General points out, that the Institute has made no effort to produce testimony from any of the aides in support of the suggestion that one of them must have been the source of the advice to Henley. Only the testimony of one aide was offered, and he had nothing of substance to say on this point.

Based upon the foregoing status of the direct and circumstantial evidence, the Attorney General contends that there is (1) no writing by Hughes adopting the "in the absence of" sentence or even referring to it, (2) no writing by anyone else which specifically states that Hughes had approved the sentence for inclusion in the bylaws, and (3) no person who has even a memory of being told by Hughes or by anyone else that Hughes had approved the inclusion of the sentence in the 1971 bylaws. As to this, I agree that the Attorney General is correct. The effect to be given to this status of the evidence will be addressed hereafter. Before proceeding to do so, however, it is necessary to consider a second major argument advanced by the Attorney General.

## IX

Relying further upon circumstantial evidence, the Attorney General points to another factor from which he urges that the inference can be drawn that Hughes never approved of the sentence in issue as part of the 1971 bylaws. Specifically, the Attorney General argues that the "in the absence of" sentence, in its effect, is no different from the Cook sentence that was included in the 1968 bylaws, and given the strong adverse reaction of Hughes to the Cook sentence, and the resultant banishment of Raymond Cook, a longtime legal advisor to Hughes, from all further connection with the Institute, it is implausible to think that a short time later Hughes would have agreed passively to the successorship provision recommended by Davis which, in effect, was no different from the provision drafted by Cook. To put this aspect of the matter in perspective, it is necessary to first turn to the testimony of Chester Davis.

It is the contention of Davis in his testimony that at some point he had a telephone conversation with Hughes concerning the advisability of including a provision in the bylaws to deal with the manner of designating his successor as Trustee. Davis has no recollection as to when the conversation took place, but he reasons that it must have been sometime after February 20, 1971 and prior to April 5, 1971. He has no written memorandum of it. However, he recalls it as being a conversation conducted through an aide, but one in which he could hear Hughes directing questions and comments to the aide in the background. He thinks that at some point Hughes got on the telephone himself.

Davis indicates that it was during this conversation that he first learned what it was about the Cook sentence in the 1968 bylaws that had bothered Hughes. He indicates that the "in the absence of" sentence was drafted by him thereafter so as to overcome this objectionable feature of the Cook sentence and to express that which Hughes desired with regard to his successorship. Briefly put, according to Davis, it was Hughes's position that he wanted to retain the right during his lifetime to designate a single person to succeed him as Trustee, but he did not want to give any one else the power to appoint only one individual to succeed him as sole Trustee thereafter.

In describing this conversation with Hughes concerning the proposed 1971 bylaws, Davis states as follows:

"My recollection is that I was having an exchange with Mr. Hughes through his aide with respect to the fact that I was being told that Mr. Hughes didn't understand why he had to exercise his right under the charter to designate a successor trustee if he chose not to do so, or words to that effect.

"And I said 'If he doesn't, somebody will do it.' And there was some reference to the fact, 'Well, Mr. Hughes does not want the Delaware courts to do it.' Words to that effect.

\* \* \* \* \* \*

"But what I recall is that in the questions and answers that were being put to me, whoever the aide was at one point said, well, why don't you talk to him directly?

"Now, that may be the last of the conversation that I recall having with him. Because what I remember with a great deal of clarity, and if I am correct in that recollection, then it was at the time when I said to Mr. Hughes, well, in the last analysis, you have to have confidence in whoever it is that you're going to leave behind. And the only solution I can suggest to the problem that you're raising is in putting in a provision that would permit the executive committee to exercise the powers of the trustee without empowering them to designate a successor trustee.

\* \* \* \* \* \*

"What I am directing myself to is, I remember very clearly the end of a conversation with Mr. Hughes talking to me, saying, well, I want to be absolutely sure that there is no change of any kind whatsoever in the provisions of the charter. I want to be absolutely sure that I retain the power to designate a successor trustee. I don't want anything said or done anywhere at any time that in any way could be construed as modifying, altering or diluting my rights under the provisions of the charter, or modifying the charter in any way; words to that effect.

\* \* \* \* \* \*

"And he said, 'No. What I don't want is to be forced to have a successor trustee.' It was only when I got that message I understood what he was driving at. Then I said, 'Well, the only solution I can suggest to that problem is that of empowering the executive committee to exercise the powers of a successor trustee

without giving them the power to designate a successor trustee.

"That was the end of the exchange."

Later in his testimony Davis recalls having a conversation with Nadine Henley and Raymond Holliday on this subject and he recalls explaining to them the difference between the Cook sentence to which Hughes had objected and the solution which he had proposed to Hughes. While he does not recall when or where this conversation took place either, he dates it as being prior to April 5, 1971. On this point, his testimony is as follows:

"What I told them was the same as I have been telling everybody, that there is a difference between having the power to designate one single individual to be in complete control of a situation, and leaving the situation where the control is exercised by a committee; and that the right to a provision which would enable a committee or a board of directors to exercise broad powers, however they may be defined, is different from that of enabling any group of people or any one person to designate a czar following in the footsteps of Mr. Hughes; which my understanding was, he was—he wanted the right to do so as long as he wanted to do so, but did not want to be obligated to designate a czar to follow him.

"That was my understanding of the situation. And that, as I recall, I was explaining to them [Henley and Holliday] what it was that I understood Mr. Hughes when he last said, well, be sure and check and double check what you're talking about is not inconsistent with the provisions of the charter, was referring to."

Davis further indicates in his testimony that his memorandum to Hughes of April 5, 1971, the one in which the "in the absence of" sentence was first set forth and recommended for inclusion in the bylaws, was a direct result of his aforementioned telephone conversation with Hughes, and that as a consequence, since Davis was offering in his memorandum language to be included

in the bylaws so as to satisfy the specific wishes of Hughes as expressed in the telephone conversation, there is every reason to believe that Hughes would have thereafter given his approval to the inclusion of the sentence in the bylaws even though there may be no direct evidence that he ever did so.

The Attorney General views the import of the "in the absence of" sentence to be substantially different. To begin with, the Attorney General has serious doubt as to the credibility to be accorded to the testimony of Davis on this point. For one thing, the Attorney General notes that in his memorandum of April 5 Davis makes no mention of any telephone conversation with Hughes or that his memo is in response to any inquiry made by Hughes during such a conversation. Rather, the April 5 memo of Davis refers only to his previous memorandum of February 5, which it is acknowledged that Hughes may not have read. Given the significance that Davis attaches to his telephone conversation with Hughes, and given his testimony that the April 5 memorandum was written as a direct outgrowth of the wishes of Hughes as expressed in that telephone conversation, the fact that the memorandum makes no reference to the telephone conversation is viewed with a great deal of suspicion by the Attorney General.

Secondly, despite the testimony of Davis to the contrary, neither Holliday or Henley have any recollection of a discussion with Davis in which he referred to this telephone conversation with Hughes or in which he explained the difference in the successorship solution which he had proposed to Hughes as contrasted to that contained in the Cook sentence in the 1968 bylaws. In fact, in his testimony offered in this proceeding, Holliday indicates that he still cannot appreciate the distinction between the Cook sentence and the "in the absence of" sentence. This leads to the point made by the Attorney General.

It is to be recalled that the Cook sentence, to which Hughes reacted so violently, reads as follows:

"If the original Trustee shall fail to name successor Trustees or to designate the manner in which they are to be selected, then the Executive Committee shall name the successor Trustees."

This is to be compared with the "in the absence of" sentence which, again, reads as follows:

"In the absence of a Trustee, the Executive Committee shall also have and may exercise the powers of the Trustee."

Since it is conceded that Article "Eighth" of the certificate of incorporation of the Institute empowered Hughes as the original Trustee to name either a Successor Trustee or Trustees, it is readily apparent that the "in the absence of" sentence, by granting the Executive Committee the same power in Hughes's absence, empowered the Executive Committee to appoint a single successor Trustee to the same extent as did the Cook sentence. Thus, the rationale offered by Davis in support of the "in the absence of" sentence rings somewhat hollow. The sentence does not assure the governance of the Institute by a committee or group of persons following the death of Hughes. On the contrary, it would appear to have empowered the members of the Executive Committee to appoint a single Trustee, or "czar," to follow in his footsteps had they been so inclined.

On this same point, the Institute attempts to argue that it was not the Cook sentence itself that upset Hughes with regard to the 1968 bylaws, but rather it was the fact that the bylaws were adopted without his knowledge plus the fact that, read literally, the Cook sentence would have permitted the Executive Committee to designate a person to succeed Hughes even during his lifetime. By way of contrast the Institute points out that the "in the absence of" sentence was actually submitted to Hughes for his approval and that as written the power granted to the Executive Committee by it came into play only in the

event that Hughes died without naming or designating the manner of choosing his successor. Thus, it is argued that Hughes would not have had the same reasons to object to it as he did with regard to the Cook sentence.

I take note, however, that both Holliday and Davis indicate in their testimony that the thing that "the old man was on the warpath" about in the spring of 1970 when Holliday was summoned back from Ireland was the Cook sentence which purported to permit the Executive Committee to appoint a successor Trustee in the event that he failed to act to do so.

## X

To recapitulate then, the factual issue before the Court is whether Howard Hughes, as sole Trustee of the Institute, ever approved and adopted the "in the absence of" sentence as part of the bylaws of the Institute. On this issue, what does the relevant evidence show?

On the side of the Attorney General the status of the record is that there is no direct evidence that Hughes ever gave his approval for the inclusion of the sentence in the bylaws. Moreover, the inference that can be reasonably drawn from the circumstantial evidence supports the conclusion that he did not do so. Specifically, the extreme significance of any decision on Hughes's part to finally provide a means to pass control of the Institute upon his death, the fact that his key personnel had been expectantly awaiting action by him on the bylaws for months, and the fact that his personal secretary and liaison with the Institute— she of the efficient and meticulous nature— was poised and waiting before releasing the bylaws for some reaction from Hughes to the recommendation of Davis that the "in the absence of" sentence be added to the final draft of the bylaws that she was holding, all tend to indicate that someone within his organization should certainly have had some recollection as to when and how the word of approval from Hughes was communicated, if in fact it ever was. This is especially true when it is considered that at that time word from Hughes always had to come through an aide at location, and sometimes through operations as well. Yet no one has any such recollection.

In addition, the fact that the "in the absence of" sentence, despite the intention of Davis in drafting it, permitted the Executive Committee to designate a sole Trustee to succeed Hughes if it so desired—the very thing which, according to Davis, so angered Hughes about the Cook sentence in the 1968 bylaws—further lends support to the conclusion that Hughes would not have given his approval to the addition of the sentence to the bylaws.

As noted at the outset, this case is one which in the main involves inferences to be drawn from circumstantial evidence. Circumstantial evidence is where some facts being proved, another fact, the fact in issue, follows as a natural or very probable conclusion from the facts actually proven. It is an inference of fact from other facts proved. *Matter of Langmeier,* Del.Ch., 466 A.2d 386 (1983); *Fahey v. Niles,* Del.Super., 108 A. 135 (1918). In weighing whether the facts in evidence correctly point to the accuracy of the conclusion sought to be derived from them, the trier of the facts—in this case the Court—must use its experience with people and events in arriving at its determination. *Henry v. State,* Del.Supr., 298 A.2d 327 (1972). Applying these factors to the evidentiary record of this case, I am satisfied that the Attorney General has convincingly established through circumstantial evidence that no actual proof exists that Hughes ever gave his approval that the sentence recommended by Davis be included as part of the bylaws.

But on the other side of the ledger, what do we have? For one thing we have the unequivocal and uncontradicted testimony of Nadine Henley, as the loyal personal secretary of Hughes of many years standing, that, in effect, it was her custom and practice not to release any documents as representing the act or decision of Hughes on a given matter unless she was first ad-

vised by someone in a proper position to make such communications on his behalf that Hughes had given his authorization for such action. Secondly, we have the fact that the bylaws, including the "in the absence of" sentence, were openly maintained as such in the minute book of the corporation from July 1971 onward, and were expressly relied upon as being the bylaws of the Institute in connection with Internal Revenue Service matters as well as in connection with an investigatory hearing before a committee of the United States House of Representatives. Moreover, Hughes lived and continued to serve in his capacity of sole Trustee for the Institute for a period of almost five years following the inclusion of the bylaws in the minute book of the corporation, and during that time there is no indication of any dissatisfaction on his part concerning either the bylaws in general or the "in the absence of" sentence in particular.

Concerning the first of these two factors, Rule 406 of the Delaware Uniform Rules of Evidence provides as follows:

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

Thus, I think it fair to say that the uncontradicted testimony of Henley concerning her habit as Hughes's personal secretary fairly gives rise to an inference that prior to sending her letter of July 16, 1971 to Holliday she was informed by someone on Hughes's behalf that he had given his approval to the addition of the "in the absence of" sentence to the bylaws.

The Delaware comment to Rule 406 cautions that evidence of habit should be admitted only after careful consideration by the court of whether the conduct is in fact a habit and, further, that the method of proof of habit should be left to the courts on a case-by-case basis. It is true that all we

have here to establish this habit on the part of Henley is the testimony of Henley herself. However, under Rule 406 corroboration is not required, and given the responsibility that Henley would have had in taking actions on behalf of Hughes and in setting things in motion for him over the years under circumstances where she could neither see nor talk to him personally, it would seem reasonable to believe that she would have been very careful in adopting a practice of not sending messages or releasing documents evidencing his acts until she was satisfied in her own mind that by her actions she would be carrying out the wishes of her employer. In addition, an overall reading of her testimony convinces me that it was sincerely given and that, accordingly, her testimony as to her custom and habit should be received.

■ As to the second factor in favor of the Institute, namely, that the bylaws including the "in the absence of" sentence were regularly maintained in the corporate record books as the bylaws of the corporation and were openly relied upon in connection with federal government activity as being the bylaws of the corporation, the authorities are somewhat scarce. Nonetheless, it is stated generally at 18 *C.J.S.*, Corporations § 189(g) that "[t]he presumption of law is that a corporation exercises its powers according to law; its by-laws are therefore presumptively valid ...." Furthermore, where the records of a corporation show that action was taken, "it is presumed that such records are correct and regular." 31A *C.J.S.*, Evidence § 150(a)(1).

In our case decisions which touch at least tangentially on the subject, it is stated, for example, as follows in *Phoenix Finance Corp. v. Iowa-Wisconsin Bridge Co.*, Del.Super., 16 A.2d 789, 794 (1940):

"We think that corporate minutes are prima facie evidence of the proceedings which transpired at the meeting, but that competent testimony is admissible in supplementing such minutes where a matter has been omitted."

And in *Young v. Janas,* Del.Ch., 103 A.2d 299 (1954) it was stated rather generally that the minutes of a meeting of the directors of a corporation are prima facie correct. See also, 18 *Am.Jur.2d,* Corporations § 177 ("... the records and minutes of a corporation are not conclusive even against the corporation, but are prima facie evidence only.")

From this I think it is fair to reach the conclusion that where corporate bylaws give the appearance on the records of the corporation as having been adopted by those with the authority to do so, where they are regularly maintained in the records of the corporation thereafter and where they are relied upon in dealings with others as being the bylaws of the corporation, there arises a rebuttable presumption that they were regularly and properly adopted.

Consequently, as I view the matter, the question for decision reduces itself to the following posture. Neither side has any direct evidence that Hughes either did or did not adopt the "in the absence of" sentence as part of the Institute's bylaws. The Attorney General does, however, have the benefit of circumstantial evidence which convincingly supports the inference that Hughes never gave his approval of the sentence. Opposed to this the Institute has available to it the inference derived from Henley's testimony that she would not have sent the July 16 letter to Holliday releasing the bylaws with the "in the absence of" sentence for inclusion in the corporate records unless she had received word that it was Hughes's wish and decision that she do so. In addition, the Institute has the benefit of a rebuttable presumption of fact that the bylaws were regularly and properly adopted by Hughes.

In short, we have an inference drawn from circumstantial evidence on the one side versus a presumption and a factual inference drawn from a rule of evidence on the other. This apparent standoff necessar-ily directs attention to the question of who bears the burden of proof concerning the validity of the "in the absence of" sentence as a part of the bylaws of the Institute.

### XI

It seems obvious that this question has been in the minds of the parties from the outset. This is indicated by the jockeying that went on at the time that the suit was filed. The initial complaint avoided any mention of the bylaws and simply relied on the certificate of incorporation. It sought relief on the basis of the fact that the certificate called for a Trustee to manage the corporation and that the failure of Hughes to appoint a successor had left the position vacant. This strategy appears to have been designed to entice the Institute to rely on the bylaws as an affirmative defense, thus casting upon it the burden of proving the adoption of the "in the absence of" sentence by Hughes.

The Institute, of course, responded to the filing of the suit by amending the certificate of incorporation so as to eliminate the position of Trustee. It took this action through the Executive Committee under the authority of "in the absence of" sentence in the bylaws as they appeared on the records of the corporation. This forced the Attorney General to file an amended and supplemental complaint to challenge the "in the absence of" sentence by alleging that the amendment of the certificate of incorporation by the Executive Committee was unauthorized and thus of no effect.

The usual rule is that the burden of proof in a civil action rests upon him who makes the allegations. *Murphy v. T.B. O'Toole, Inc.,* Del.Super., 87 A.2d 637 (1952); 31A *C.J.S.,* Evidence § 104. It seems obvious here that the Attorney General has structured his pleadings and the presentation of his case in such a manner as to attempt to place the burden of proving the validity of the bylaws on the Institute.[3]

---

**3.** At trial, the Attorney General attempted to place his documentary case of record without

offering a copy of the bylaws into evidence as an exhibit. This, of course, was a stratagem

Despite this effort, however, I think it clear in this case that the burden of proof is on the Attorney General and that in the procedural posture of the matter it is incumbent upon the Attorney General to prove by a preponderance of the evidence that the "in the absence of" sentence was never adopted as part of the bylaws by Hughes. I note too that this requires the Attorney General to prove a negative, i.e., the nonexistence of a fact, in order to prevail. This is of no material consequence, however, since the burden of proof as to a negative proposition also rests upon the party asserting it. 31 *C.J.S.*, Evidence § 105; 1 Jones, *On Evidence (6th Ed.)* § 5:8.

Nonetheless, in one final effort to switch the burden of proof to the Institute, the Attorney General relies on the case of *Melson v. Michlin,* Del.Supr., 223 A.2d 338 (1966). That decision held that in business dealings between an attorney and his client the attorney bears the burden of proving that his client gave informed consent to any transaction which benefited the attorney. In attempting to apply that rule to the present situation, the Attorney General argues that at the time that Chester Davis drafted the "in the absence of" sentence and recommended its inclusion in the bylaws to Hughes, Davis was not only Hughes's attorney but, along with Holliday and Gay, he was a member of the Executive Committee. Since he was recommending, in effect, that Hughes make the Executive Committee of which he was a member the

successor to Hughes as Trustee, and since he was thus recommending a bylaw provision which could potentially turn control of the Institute, along with that of Hughes Aircraft, over to himself together with Gay and Holliday, the Attorney General argues that the transaction being proposed by Davis was of enormous potential benefit to Davis. Accordingly, under *Melson v. Michlin, supra,* the Attorney General argues that since the Institute is relying on the testimony and conduct of Davis in the defense of this matter, it should have the burden of proving that Hughes adopted the "in the absence of" sentence as part of the bylaws only after full disclosure to him of the personal benefit that Davis, as his attorney, stood to reap from the inclusion of the sentence in the bylaws.

However, I agree with the Institute that the rationale of *Melson v. Michlin* does not apply so as to control the burden of proof issue in this case. This is not a suit by Hughes's estate against Davis to set aside some benefit he received as a result of a business transaction with his client. Moreover, in the context of the evidence, I do not view Davis's advice to Hughes concerning the bylaws of the Institute to be a business transaction between Davis and Hughes in the sense contemplated in *Melson v. Michlin.* Accordingly, this argument of the Attorney General is rejected.

■ Finally, lest there be any doubt as to which of the parties bears the burden of

designed to make the Institute offer the bylaws into evidence as part of its defense. Had this occurred, the Attorney General hoped to then be in the position to argue that the burden of proving the bylaws of the corporation is on the party offering them in evidence. 8 Fletcher, *Cyclopedia of the Law of Private Corporations* § 4174. However, it turned out that copies of the bylaws including the "in the absence of" sentence were attached to other documents placed in evidence by the Attorney General and thus the ploy evaporated.

On this same point, the Institute moved for a dismissal upon the Attorney General resting his evidentiary case. The basis was that the Attorney General, in the manner previously indicated, had inadvertently placed a copy of the bylaws into evidence as part of his case and

had failed to carry his burden of proving that the "in the absence of" sentence was not legally a part of them. Since the Attorney General's case was unexpectedly submitted on a paper record of documents and deposition testimony, and since the Court had not read any of them at that point, it was impossible to rule upon the motion to dismiss at the time that it was presented and accordingly, pursuant to Rule 41(b), decision on the motion was reserved until the close of all the evidence. For the reasons set forth in the text of this decision, I find that the Attorney General presented a sufficient case on the evidence submitted by him, even including a copy of the bylaws, to withstand a motion to dismiss, and accordingly that motion of the Institute is denied.

proof concerning the "in the absence of" sentence, I think it appropriate to take note of Rule 301 of the Delaware Uniform Rules of Evidence. That Rule deals with the effect of evidentiary presumptions in civil proceedings. It is unlike its counterpart in the Federal Rules of Evidence in that it accords substantially more weight to a presumption than does the Federal rule. The Delaware rule is set forth as follows at Rule 301(a):

"(a) Effect. In all civil actions and proceedings not otherwise provided for by statute or by these Rules, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

Thus, under Delaware law, a presumption does not merely shift to the other party the burden of going forward with evidence to counter the effect of the presumption. Our Rule 301 does not embrace the "bursting bubble" theory under which the evidentiary weight of the presumption vanishes once the opposing party comes forward with evidence to rebut it. See the Comment to Rule 301. Rather, as it states, our Rule 301 imposes upon the party against whom the presumption is directed "the burden of proving" that the nonexistence of the presumed fact is more probable than its existence.

In this case I have found on the evidence submitted (which would include the evidence submitted by the Attorney General as part of his case in chief) that the Institute is entitled to the benefit of a presumption of fact that the bylaws of the Institute which included the "in the absence of" sentence were properly adopted by Hughes. Accordingly, under Rule 301(a), this presumption casts upon the Attorney General the burden of proving that the nonexistence of the presumed fact, namely, that the "in the absence of" sentence was adopted by Hughes as part of the bylaws, is more probable than its existence.

Thus, both from the issues established by the pleadings as well as from the evidentia-ry posture of the case, I find that the burden of proof with regard to the challenged bylaw sentence is upon the Attorney General. Applying this standard, I turn to what I feel must be the decision on this aspect of the case.

## XII

I think that it should be obvious to anyone who has stayed with this decision this far that this is a difficult case to decide. The situation and function of the Court here is well summarized by the following statement from 1 *Jones, On Evidence (6th Ed.)* § 5:1 at page 518:

"Questions presented for judicial determination are inherently controversial, and the issues are so framed that it is rarely possible to resolve them with absolute certainty. The real or autoptic type of evidence tells its own story and something like absolute verity may be achieved within the scope of what it reveals. But this type of evidence more often has a circumstantial bearing on the real issue to be determined, and the litigant must rely on all sorts of circumstantial and testimonial evidence to persuade the trier of the fact that his position is true.

"Thus, since the controversy must be resolved, when all is said and done, the judge or jury charged with the necessity of deciding the issue must, in the absence of certainty, resort to a comparison of probabilities."

There is no certainty in this case on the question of whether or not Howard Hughes ever purposely adopted or intended to adopt the "in the absence of" sentence as part of the bylaws of the Institute. However, by comparing the probabilities established by the evidence referred to herein, I am convinced that the answer must be that he did not do so.

As noted previously, the burden cast upon the Attorney General is that of proving a negative, and in so doing he is required to overcome the presumption that Hughes must have taken the action necessary to

adopt the challenged bylaw sentence. Has the Attorney General met this burden? I think that he has.

Starting with the conceded premise that there is no direct evidence that would establish such action by Hughes, the Attorney General has gone on to show that the March 18, 1971 resolution signed by Hughes as Trustee—the corporate record relied upon by the Institute as the document evidencing his approval of the bylaws—could not have served to approve the "in the absence of" sentence on the day that it was executed. This is because the sentence did not come into existence until some two weeks thereafter when Chester Davis first drafted it. At the time that the March 18 resolution was signed by Hughes, the "in the absence of" sentence had not yet been submitted to him for consideration. Thus, proof of some act by Hughes subsequent to the date of the resolution is needed.

As to this it is the established fact that there is no writing or memorandum attributable to anyone within the Hughes organization, including his attorneys and those working directly with him on the bylaws, which purports to memorialize that Hughes had given his consent to the inclusion of the sentence in the bylaws. Davis never received a response on behalf of Hughes to his April 5, 1971 memorandum in which the recommendation was made. And even Henley's letter of July 16, 1971 cannot fill this void since it makes no reference to any decision made by Hughes concerning the sentence or Davis's recommendation.

Added to this is the fact that through the testimony of all key personnel and attorneys working within and in conjunction with the Hughes organization at the time— that is, those persons among whom someone would be expected to have knowledge of such a monumental decision on the part of Hughes—the Attorney General has established that none of them has any recollection of being specifically informed by anyone that Hughes had made the decision to include the sentence in the bylaws. These persons, among others, include Davis, Holliday, Gay, Mintz and Henley.

Moreover, in view of the similarity of the power given to the Executive Committee by the "in the absence of" sentence when compared to that given by the 1968 Cook sentence to which Hughes acted so adversely, the Attorney General has demonstrated that in all likelihood the "in the absence of" sentence was a bylaw provision that would not have met with Hughes's approval.

Finally, I think it may be fairly considered to be a fact established from the evidence offered and relied upon the Attorney General that no copy of the final set of the bylaws including the "in the absence of" sentence was ever sent to Hughes at location following Henley's letter of July 16. Her letter does not indicate that such a copy was sent to him. Nor does her testimony. And there is no indication that anyone else sent him a copy prior to the time of his death despite the fact that the bylaws were distributed to others working for him and were relied upon by them for various purposes.

When it is considered that the presumption confronting the Attorney General is premised on a combination of the March 18 resolution, reliance on the bylaws by persons other than Hughes, and knowledge attributable to Hughes resulting from the passage of time while the challenged sentence remained housed in the records of the corporation as an apparent part of its bylaws, I think that the evidence presented by the Attorney General is sufficient to overcome the presumption that the "in the absence of" sentence was regularly and properly adopted by Hughes. Given the burden on the Attorney General to prove a negative, I fail to see what else he could have done under the circumstances to prove it. In short, comparing the probabilities reflected by the evidence offered by the Attorney General with those derived from the factors giving rise to the presumption of regularity, I am convinced that the weight of the evidence lies with the Attorney General.

With the benefit of the presumption thus overcome, the only other evidence of significance available to the Institute is the testimony of Henley as to her habit. But while I have found this evidence to be relevant and admissible, I do not find it to be of sufficient weight, even when combined with the factors giving rise to the presumption, to overcome the evidence presented by the Attorney General. Quite simply, while Henley may feel in all good faith that somebody must have told her that Hughes had given his approval of the sentence, the evidence does not point to the identity of anyone who would have done so. Neither Davis nor Holliday—the two persons through whom Henley believes the word would probably have come to her—have a recollection of receiving any word from Hughes on the subject. Moreover, assuming as I think we must that any word communicating Hughes's approval of the sentence would have necessarily come through an aide in the first instance, there is no testimony from any of those persons serving as Hughes's aides at the time that they communicated such a message to Henley or anyone else on Hughes's behalf.

Thus, while Henley's established habit may serve to excuse her personal inability to remember who it was who told her that it was all right to release the bylaws with the sentence included, the total lack of any corroborating evidence to indicate that someone within the organization passed on the word to her from Hughes detracts seriously from the weight to be accorded to her habit testimony. Stated another way, evidence of her habit indicates that in all probability someone gave her the go ahead to include the sentence in the bylaws but it does not necessarily go on to establish that Hughes gave his word of approval to whoever it was who gave the word to her. Within the communications set up of the Hughes organization, word from Hughes always came through another. Henley's habit may serve to establish that she received word from someone, but it cannot go further to establish also that Hughes made a decision and communicated it to that person. And it is this latter point that the Institute seeks to have established through Henley's testimony.

Under the circumstances of this case, then, given the significance that would have attached to the communication of a decision by Hughes that he had selected his personally appointed Executive Committee to succeed him in exercising all of the powers of the Trustee of the Institute in the event that he otherwise failed to provide for a successor either before his death or by testamentary direction, the fact that there is nothing else in the record to directly corroborate or support the inference flowing from Henley's habit and custom persuades me that her act in sending her letter of July 16, 1971 cannot rise to overcome the various undisputed factors relied upon by the Attorney General which point realistically to the conclusion that Hughes never took any action between April 5, 1971 and July 16, 1971 to adopt the "in the absence of" sentence as part of the bylaws of the Institute.

 The burden on the Attorney General is to prove his case by a preponderance of the evidence. The side on which the preponderance of the evidence exists is the side on which the greater weight of the evidence is found. *Reynolds v. Reynolds,* Del.Supr., 237 A.2d 708 (1967). I find that the greater weight of the evidence favors the Attorney General. I am not particularly happy to be forced to reach such a decision, but in good conscience I can reach no other. I conclude on the evidence that Hughes never adopted the "in the absence of" sentence.

### XIII

In what I think can be fairly characterized as a fall-back position, the Institute makes a further argument based upon the Delaware statutes applicable to nonstock corporations. It takes the position that even if the Court should find that the "in the absence of" sentence was not effectively adopted by Hughes as a part of the

bylaws, it is of no material consequence to the outcome of the case. This is so, argues the Institute, because upon the death of Hughes without a successor having been designated by him the Executive Committee became the "governing body" of the corporation and, as such, it became possessed by statute of the power to amend the certificate of incorporation so as to eliminate the position of Trustee.

In constructing this argument the Institute begins with the fundamental principle that the Delaware corporation law, to the maximum extent possible, is designed to permit a corporation—and particularly a nonprofit corporation—to regulate its own affairs. See E. Folk, *The Delaware General Corporation Law (1972)* 10, 53–54, 67. This fundamental principle is said to be reflected in 8 *Del.C.* § 242(c)(3) which specifically gives "the governing body" of a nonstock corporation the power to amend its certificate. The governing body of a nonstock corporation is necessarily comprised of those persons with the authority to manage its affairs, and pursuant to 8 *Del.C.* § 141(j) one must look to the certificate of incorporation in order to ascertain the manner in which it is to be managed.

As set forth earlier in this decision, Article Fifth of the original certificate of incorporation of the Institute provided that the corporation was to have no capital stock and that it was to be "managed and controlled by a Trustee." Article Fifth went on to provide, however, that "[t]he Trustee may, at any time and from time to time, delegate any responsibility and authority to such persons as he may select, in accordance with such by-laws or resolutions as the Trustee may adopt."

With this in mind the Institute points to the fact that in 1968, when Hughes was restructuring the Executive Committee so as to comprise it of Cook, Drury and Holliday, he adopted a resolution (also set forth previously herein) which stated that except as otherwise provided in the certificate of incorporation or by further resolution of the Trustee, there was delegated to the Execu-

tive Committee "all of the duties and powers to manage the affairs of the corporation which Delaware law has conferred upon the boards of directors of corporations organized for profit."

The import of this resolution by Hughes as Trustee was carried forward in the 1971 bylaws which, in relevant part, state as follows:

"The affairs of the corporation shall be managed by an executive Committee which shall have and may exercise all of the rights and powers to manage the corporation as are conferred upon boards of directors of corporations organized for profit by the laws of the State of Delaware, and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by resolution of the Trustee or by these by-laws directed or required to be done or exercised by the Trustee."

This language was contained in the draft of the bylaws as they existed on March 18, 1971, the date on which Hughes signed the resolution adopting bylaws for the Institute, and it is undisputed that this provision formed a part of the bylaws both at the date of Hughes's death as well as in 1978 when the Executive Committee took action to purportedly amend the certificate of incorporation.

Since it is established that during his lifetime Hughes bestowed upon the Executive Committee all of the managerial powers that are conferred by statute on the board of directors of a corporation for profit, the Institute argues that Hughes authorized the Executive Committee, along with himself, to act as a governing body for the corporation. It goes on to argue that when Hughes died in 1976 the sole remaining "governing body" of the Institute was the Executive Committee. As the only remaining governing body, it is contended by the Institute that the Executive Committee thereby became vested by statute with the power to amend the certificate of incorporation. Having amended the certificate so as to eliminate the position of Trustee, the

Executive Committee has now become the sole governing body of the corporation for all purposes hereafter and consequently there is no need for this Court to meddle in the internal affairs of the corporation, or so the argument goes.

But this argument is not persuasive. As the Attorney General points out, it is the equivalent of arguing that on the death of the principal the agent becomes the principal. More importantly, I think that this argument of the Institute tends to overlook what this case is all about. This is not a case to determine who has a right to manage the affairs of a nonstock corporation. Rather, the issue here is who has the right to control the Institute and, as I view it, the right to control the Institute necessarily includes the right to determine who will manage its affairs.

Article Fifth of the original certificate of incorporation stated that the Institute would be both "managed and controlled" by a Trustee. It also stated that the Trustee might delegate "any responsibility and authority" to such persons as he might select. By his 1968 resolution as well as by the 1971 bylaws Hughes delegated to his Executive Committee the responsibility and authority to manage the affairs of the corporation. The evidence is overwhelming, however, that at no time did he intend to surrender control of the Institute to the Executive Committee. That power he clearly reserved to himself as Trustee, and he further left no doubt that he reserved the right to pass control of the corporation to whomsoever he chose under the portion of the certificate that empowered him to designate his successor. Thus, I think it well established that neither by the 1968 resolution nor by the 1971 bylaw provision did Hughes intend to bestow upon the Executive Committee any power to determine who would be in control of the corporation, let alone the power to grant control to itself. He delegated his right to manage the corporation only.

Since the statutes require that a nonstock corporation have "members" as opposed to shareholders, see 8 *Del.C.* § 102(a)(4), the argument of the Institute thus reduces itself to the proposition that upon the death of the members of a nonstock corporation those who comprise the governing body of the corporation automatically become its members by operation of law. It is an argument that those who are the equivalent of directors become, by default, the equivalent of shareholders in the absence of shareholders. Not unexpectedly, the Institute cites no authority in support of this novel theory.

Moreover, both the 1968 resolution and the comparable provision of the 1971 bylaws placed limitations on the managerial authority granted to the Executive Committee. It was given the authority to act to manage the affairs of the corporation only to the extent, among other things, that such acts were not required by the certificate of incorporation to be done or exercised by the Trustee. Article Thirteenth of the original certificate of incorporation of the Institute specifically provided that the certificate of incorporation could only be amended by the Trustee. Thus, I fail to see how the Institute can claim that the managerial authority granted by either the 1968 resolution or the 1971 bylaws can be said to have delegated to the Executive Committee the authority to amend the certificate of incorporation.

Realistically speaking, I find it more reasonable to conclude that, to the extent that the Executive Committee was left as the sole managerial authority for the Institute upon the death of Hughes without a successor Trustee having been appointed, its role became, in effect, that of a caretaker board, charged with the responsibility of preserving the assets of the corporation and overseeing its charitable functions until such time as the question of its future control could be resolved. I cannot conclude under the statutes that simply because the Executive Committee was the sole managerial body left remaining to guide the affairs of the corporation upon the death of Hughes that it thereby inherited the right to control the corporation also to the extent of being

empowered to amend the certificate of incorporation so as to eliminate the office of Trustee from which it derived its authority to act in the first place. I also note that prior to his death Hughes's attorneys must have been of the same view since they continually advised him to make provision for a successor Trustee, something that would have been unnecessary had they truly thought that the Executive Committee, as the surviving governing body, would have succeeded to the power of the Trustee by statute.

Accordingly, I reject also what I have characterized to be the fall-back position of the Institute.

## XIV

In conclusion, I find on the evidence and the arguments presented that the act of the Executive Committee in purporting to amend the certificate of incorporation of the Institute is void and of no effect due to the lack of any power and authority in the Executive Committee to bring about such an amendment. I find further that the certificate of incorporation of the Institute requires that it be managed and controlled by a Trustee or Trustees. I find also that the position of Trustee is vacant due to the fact that the original Trustee died without either naming Successor Trustees or establishing a manner in which Successor Trustees might be designated. In view of the charitable, nonprofit purpose of this Delaware corporation and the consequent interest of the public in the proper management of its affairs, I therefore conclude that it is incumbent on this Court to name Successor Trustees to control and manage the affairs of the corporation hereafter.

In so doing, I think it appropriate to pay homage to two observations attributed to Howard Hughes during the course of the testimony offered in this case. First, I share his distaste at the thought of a Delaware Court stepping in to designate the person or persons to succeed him as Trustee. It was his corporation, his charity and his decision to make as to who his successors

should be. I would have much preferred that he had taken care of it properly and in a manner free from doubt, as his advisors continually urged him to do. Falling heir to the function certainly represents no bargain for the Court.

Secondly, I agree that only Hughes should have been the person to name a single individual to succeed himself as Trustee. Again, it was his corporation and his assets that went to fund it from the beginning. If he had elected to pass its control to one person only so as to have that person continue on as he had done as sole Trustee, it was his business to do so. However, for this Court to now bestow control on one single person as Successor Trustee would not only seem a bit presumptuous but it would call for the wisdom of a Solomon which, I readily concede, I do not possess. Therefore, since there is evidence that Hughes preferred cotrustees to succeed him in the event that he chose not to designate a single Successor Trustee himself, it would be my intention to honor the wish attributed to him and to appoint Successor Trustees as opposed to a single Successor Trustee.

In this regard, I take note that the present Executive Committee, composed of Frank William Gay and Dr. George W. Thorn, indicated prior to trial that even in the event that the Institute should prevail on the merits of this litigation it was their intention to increase the membership of the Executive Committee by four additional persons, and to name to these new positions Irving S. Shapiro, former Chairman of the Board of E.I. duPont deNemours and Company, Dr. Donald Fredriksen, former Director of the National Institute of Health, Dr. Lawrence Foraker, former Dean of the Harvard Business School, and William Graham, Chairman of the Board of Baxter Travenol Corporation. Should any of these persons still be interested in serving given the outcome of this decision, it would be my intention to consider them. Nor am I rul-

ing out Gay or Dr. Thorn, or William H. Lummis for that matter.

I ask the Attorney General to prepare an appropriate form of order reflecting the decision reached herein, and I suggest a meeting with counsel within 10 days for the purpose of establishing the course of events hereafter. In the interim, I consider that Gay and Dr. Thorn, as the present Executive Committee, continue to remain in charge of managing the affairs of the corporation pending further order of the Court.