**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE EBIX, INC. | : | **CONSOLIDATED** |
| STOCKHOLDER LITIGATION | : | **C.A. No. 8526-VCS** |

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

**WHEREAS**:

A.  Defendant, Ebix, Inc. ("Ebix"), is a Delaware corporation headquartered in Atlanta, Georgia.[1]  Ebix provides software and e-commerce services to insurance companies.[2]

B.  Ebix's board of directors (the "Board") comprises eight directors[3]: Robin Raina, Pavan Bhalla, Hans U. Keller, Hans U. Benz, Neil D. Eckert and Rolf Herter (collectively, the "Ebix Defendants") and Joseph R. Wright, Jr. and George W.

---

[1] Unless noted otherwise, the facts are drawn from the undisputed allegations in the Verified Fourth Amended and Supplemented Class Action and Derivative Complaint (the "FAC"), the parties' affidavits and exhibits and any facts of which the Court may take judicial notice.  A more detailed recitation of the facts is set forth in two prior memorandum opinions issued in connection with this action.  *See In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655 (Del. Ch. July 24, 2014) (hereinafter "*Ebix I*"); *In re Ebix, Inc. S'holder Litig.*, 2016 WL 208402 (Del. Ch. Jan. 15, 2016) (hereinafter "*Ebix II*").

[2] FAC ¶ 24; Answer of Def. Robin Raina to the Verified Fourth Am. and Supplemented Class Action and Deriv. Compl. ("Raina's Answer") ¶ 24.

[3] Transmittal Aff. of John G. Day in Supp. of Pls.' Answering Br. in Opp'n to Defs.' Mots. for Summ. J. ("Day Aff."), Ex. 126 (2017 Proxy Statement) at 18.

Hebard III (the "Barington Defendants" and together with the Ebix Defendants, the "Director Defendants"). The Ebix Defendants joined the Board in or before 2005[4]; the Barington Defendants joined the Board in 2015 as designees of Ebix stockholder, Barington Capital Group, L.P. ("Barington").[5]

C. Plaintiffs filed their initial class action complaint on May 6, 2013, in which they sought to enjoin a transaction between Ebix and affiliates of Goldman, Sachs & Co. When the merger discussions terminated, Plaintiffs abandoned their merger-related claims and shifted their focus to certain compensation and related agreements between Ebix and its CEO, Robin Raina, as well as other Ebix executives and directors. The operative complaint, the FAC, implicates the following conduct or agreements[6]:

1. In 2009, Ebix entered into the Acquisition Bonus Agreement ("ABA") with Raina.[7] Ebix first disclosed the ABA to stockholders in its July 21, 2009 Form 8-K.[8] The ABA provided Raina the right to receive certain bonus payments

---

[4] Raina joined the Board in 2000, Bhalla and Keller in 2004 and Benz, Eckert and Herter in 2005. FAC ¶¶ 25–30.

[5] FAC ¶¶ 26–32; Raina's Answer ¶¶ 26–32.

[6] D.I. 343; FAC ¶¶ 254–318.

[7] Day Aff., Ex. 77 (July 15, 2009 Form 8-K), Item 5.02.

[8] *See id.*

upon an "Acquisition Event."[9]  Per the July 21, 2009 disclosure, the independent Ebix directors "unanimously approved" the ABA on July 15, 2009, and the price of any grant to Raina under the ABA was to be determined from a "Base Price" of $23.84.[10]

2.  Since the adoption of the ABA, the Board has disclosed certain details about the ABA and its terms in Ebix's annual proxy statements.  Relevant to the claims set forth in the FAC are the disclosures in Ebix's 2010 and 2016 Proxy Statements.

(a) In the 2010 Proxy Statement, the Board disclosed "[i]n 2009 . . . the independent directors unanimously approved the Company's execution of and entry

_____

[9] As defined in the ABA, "'Acquisition Event' means the occurrence of any of the following events (or a series of related events) with respect to the Company if the stockholders of the Company immediately prior to the event(s) do not retain immediately after the event(s) (in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the event(s)), direct or indirect beneficial ownership of more than 50% of the total combined voting power of the outstanding voting securities of the Company or the entity to which the Company's assets are transferred: (i) the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than 50% of the voting stock of the Company; (ii) a merger or consolidation in which the Company is a party; (iii) the sale, exchange, or transfer of all or substantially all of the assets of the Company; or (iv) the Acquisition or dissolution of the Company.  Notwithstanding the foregoing, an event shall not constitute a[n] Acquisition Event unless it is also a 'change in control event' described in Treasury Regulations section 1.409A-3(i)(5)(i)."  Day Aff., Ex. 77 (July 15, 2009 Ebix Form 8-K), Ex. 99.1, at 1.

[10] *Id.*, Item 5.02 & Ex. 99.1, at 8.

into the [ABA]."[11] It further disclosed that the Base Price for calculation of the ABA's bonus payment was $7.95, representing "the approximate price per share of the Company's common stock on March 25, 2009, when the independent members of the Board agreed on the desirability of this type of agreement."[12] In this same filing, the Board asked Ebix stockholders to approve a stock incentive plan (the "2010 Plan") allowing grants of equity compensation to certain Ebix directors and employees.[13]

(b) In Ebix's 2016 Proxy Statement, the Board again disclosed, "[i]n 2009 . . . the independent directors unanimously approved the Company's execution of and entry into the [ABA]"[14] and that the $7.95 Base Price was the "approximate price per share of the Company's common stock on March 25, 2009 when the independent members of the Board agreed on the desirability of this type of agreement."[15] The Board also disclosed, as it had in prior proxy statements,[16] that

---

[11] Day Aff., Ex. 94 (2010 Proxy Statement) at 26.

[12] *Id.* at 27.

[13] *Id.* at 9–14.

[14] Day Aff., Ex. 121 (2016 Proxy Statement) at 33.

[15] *Id.* at 35.

[16] *See, e.g.*, Day Aff., Ex. 104 (2013 Proxy Statement) at 26 ("$23.84 (post three-for-one split, $7.95)"); Day Aff., Ex. 113 (2014 Proxy Statement) at 25 ("$7.95 (prior to the three-for-one split that occurred on January 4, 2010, this value was $23.84)").

4

the $7.95 ABA base price was the "post-stock split" price per share and that "prior to the three-for-one split that occurred on January 4, 2010, this value was $23.84."[17] In addition to the disclosures regarding the ABA, the 2016 Proxy Statement sought stockholder approval of the CEO Annual Incentive Bonus Plan (the "2016 CEO Bonus Plan") that would authorize the Board to grant additional bonus payments to Raina.[18]

3.  On December 19, 2014, the Board adopted certain amendments to Ebix's bylaws (the "2014 Bylaw Amendments") following Barington's expression of displeasure with the Board's performance and its stated desire to add directors to the Board.[19]

D.  On March 7, 2018, Defendants, Pavan Bhalla, Hans U. Keller, Hans U. Benz, Neil D. Eckert, Rolf Herter (collectively, the "Outside Directors"), the Barington Defendants and Ebix filed Motions for Summary Judgment, seeking judgment as a matter of law as to all then-extant counts of the FAC.[20]

---

[17] Day Aff., Ex. 121 (2016 Proxy Statement) at 34–35.

[18] *Id.* at 12.

[19] Day Aff., Ex. 115 (Dec. 24, 2014 Ebix Form 8-K).

[20] D.I. 381, 383, 386.  At the time of argument on Defendants' motions for summary judgment on May 23, 2018, the FAC asserted ten counts.  Defendants' motions seek summary judgment as to each count.  At that same hearing, I granted Plaintiffs' request to supplement the FAC.  The FAC, as supplemented, now contains thirteen counts.  On July 5, 2018, the parties filed a stipulation dismissing the FAC's Count VIII with prejudice.

E. On March 8, 2018, Defendant, Raina, filed his Motion for Partial Summary Judgment (together with the Outside Directors' and Ebix's motions for summary judgment, the "Motions").[21]

F. On April 10, 2018, Ebix and Raina entered into the Stock Appreciation Right Award Agreement (the "SAR Agreement"). The SAR Agreement replaces the ABA and, by its terms, terminates Ebix's and Raina's rights under the ABA.[22]

G. On April 18, 2018, Plaintiffs filed an answering brief in opposition to Defendants' Motions.[23]

---

*See* D.I. 524. In this Order, I address only the counts as set forth in the FAC as of May 23 (except the now-dismissed Count VIII).

[21] D.I. 389. Plaintiffs challenge Raina's motion (or more specifically Raina's proposed order) as failing to provide detail of the "claims he is seeking judgment on" and assert that Raina's "motion only states that the grounds for his motion are set forth in the briefs of the Outside Directors and Ebix." Pls.' Answering Br. in Opp'n to Defs.' Motions for Summ. J. ("Pls.' Answering Br.") 64–65. Plaintiffs claim Raina's "me too" motion should be "summarily denied." *Id.* at 65. I disagree. Raina's motion identifies the specific arguments raised by the Outside Directors and Ebix in which he joins and thereby provides the Court and Plaintiffs with notice of his arguments. *See* Def. Robin Raina's Mot. for Partial Summ. J. Even under the case law cited by Plaintiffs in support of their argument (which actually addresses specific protocols for dispositive motion practice in multi-defendant asbestos litigation), the information provided by Raina passes the notice requirements identified there. *In re Asbestos Litig.*, 2007 WL 2410879, at *3 (Del. Super. Ct. Aug. 27, 2007) ("[It] is reasonable to expect that a party will specifically identify which dispositive motion(s) of other parties, or arguments therein, that party intends to incorporate by reference so that the Court and the opposing parties have notice of the potentially case dispositive issues that must be addressed prior to trial.").

[22] D.I. 423 (Ltr. from Tiffany Geyer Lydon, attaching Ebix's Apr. 16, 2018 Form 8-K).

[23] D.I. 426.

6

H. On May 18, 2018, the Outside Directors, the Barington Defendants and Ebix filed their reply briefs in further support of their Motions and Raina filed his joinder in those briefs.[24] The Court heard oral argument on the Motions on May 23, 2018.

**NOW**, **THEREFORE**, on this 17th day of July, 2018, it appears to the Court that:

## The ABA—Counts I, VI, VII and X

1. It is well-settled that "when the substance of the dispute disappears due to the occurrence of certain events following the filing of an action, the matter is moot."[25]

2. Counts I and VI challenge the adoption and the maintenance of the ABA. The only remedies sought in these counts are either injunctive or declaratory relief.[26] Specifically, both counts request a declaration that the ABA is invalid and void *ab initio* because, *inter alia*, it was adopted as an improper anti-takeover defense.[27]

---

[24] D.I. 462, 465–67.

[25] *Diamond State Port Corp. v. Int'l Longshoremen's Ass'n*, 2011 WL 891201, at *1 (Del. Ch. Feb. 24, 2011) (internal quotation omitted).

[26] *See* FAC ¶¶ 258 ("no remedy at law"), 290 ("Plaintiffs seek a declaratory judgment that the ABA is invalid, *ultra vires* and void *ab initio*.") & Relief Requested (d), (e), (f).

[27] *See* FAC ¶ 258 ("no remedy at law"); Tr. of Hr'g May 23, 2018 ("Tr.") 142:21–143:1 ("THE COURT: In the current state of affairs, what is the remedy, if you prevail, on Count I? MR. FIORAVANTI: That the ABA is terminated and the SAR agreement is terminated."); FAC ¶ 290 ("Plaintiffs seek a declaratory judgment that the ABA is invalid, *ultra vires* and void *ab initio*.").

3. Ebix and Raina terminated the ABA on April 10, 2018. Thus, there is no relief available as to these two counts and no present controversy remains.[28] Accordingly, the Motions as to Counts I and VI are **GRANTED**.

4. Counts VII and X allege breaches of fiduciary duty by the Director Defendants in connection with the ABA. Here again, the only remedy Plaintiffs seek is declaratory relief.[29]

5. The claims for declaratory relief in Counts VII and X are also moot. To the extent Counts VII and X purport to state a claim for damages, the record does not support that claim. Plaintiffs allege that certain terms, which the Director Defendants have purported to add to the ABA (principally with respect to the Base Price), "deter[] potential bidders from making a premium offer in an acquisition."[30] They also allege that Raina has previously negotiated with bidders who ended the negotiations because they were unwilling to pay him the ABA bonus.[31] The FAC's

---

[28] *Multi-Fineline Electronix, Inc. v. WBL Corp. Ltd.*, 2007 WL 431050, at *8 (Del. Ch. Feb. 2, 2007) (finding mootness where the threatened injury was a lock-up provision that, at the time of the dispositive motion, was no longer in effect); *Dept. of Corr. v. Del. Corr. Officers' Ass'n*, 2002 WL 31926610, at *3 (Del. Ch. Dec. 23, 2002) (finding a contractual dispute moot where the only relief sought was injunctive in nature—relief that was no longer available after the contract was terminated).

[29] *See* FAC ¶¶ 291–301, 315–18.

[30] FAC ¶ 296.

[31] FAC ¶¶ 13–15.

allegations with regard to lost opportunities caused by the addition of terms to the ABA are unspecific, speculative and not supported by discovery.[32]

6. The Motions as to Counts VII and X are **GRANTED**.

**The 2010 Proxy Disclosure and the 2010 Plan—Counts II and III**

7. Count II alleges the Ebix Defendants intentionally disclosed false information in Ebix's 2010 Proxy Statement to secure stockholder ratification of the 2010 Plan. Specifically, Plaintiffs allege that the Ebix Defendants misled stockholders regarding the substantial payments that might be due Raina under the ABA by disclosing two false facts about the ABA: (1) that the ABA's Base Price was set "on March 25, 2009 when the independent members of the Board agreed on the desirability of this type of agreement"; and (2) that the ABA's Base Price is $7.95—the market price of Ebix's stock on March 25, 2009.[33] The 2010 Proxy Statement also omitted the following material information about the ABA: (1) Ebix's stock price on July 15, 2009 (the date the 2010 Plan was actually

---

[32] *See, e.g.*, *In re Daimlerchrysler AG Sec. Litig.*, 294 F.Supp.2d 616, 627 (D. Del. 2003) ("Lost opportunity damages are the 'loss of a possible profit or benefit, [defined as] an addition to value of one's investment, unless the loss is wholly speculative.'. . . [L]ost opportunities damages 'are not available where the fact of the loss, *i.e.* whether there was any lost opportunity at all, is wholly speculative.'" (quoting *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220, 223 (3d Cir. 2002)).

[33] FAC ¶ 261.

approved)[34]; and (2) that certain unwritten terms were added to the ABA that were not included in the actual agreement—namely, that the Base Price could be adjusted by way of a stock split, repurchased shares would be included in the bonus calculation, Raina's cash bonus would be treated as shares for purposes of calculating the share base, "the size of the bonus and grossing-up under the [ABA]" and "the deductibility of the bonus and the tax effects and tax cost of the bonus."[35]

8. In *Ebix I*, the Court found it reasonably conceivable that the 2010 Proxy Statement was materially misleading, explaining "it is reasonably conceivable that the difference in Base Price between $7.95 [the disclosed Base Price] and $23.84 [Ebix's actual market price on March 25, 2009] was material."[36]

9. A disclosure claim that passes the reasonably conceivable threshold on a motion to dismiss can, of course, fail to survive a motion for summary judgment when evidence revealed in discovery demonstrates that the omission or disclosure was either not false or not, in fact, material. Here, however, no such evidence was discovered (or, at least, none was presented to the Court). The facts (as pled in the then-operative complaint) relied upon in *Ebix I* to find that the difference between

---

[34] FAC ¶ 100.

[35] FAC ¶ 265.

[36] *Ebix I*, 2014 WL 3696655, at *25. *Ebix I* did not analyze the materiality of the remaining disclosure deficiencies. *See id.*

10

the disclosed $7.95 Base Price and the actual $23.84 Base Price (as alleged) was material—namely, the 2010 proxy disclosures, the prior disclosures and the nature of, and relationship between, the ABA and the 2010 Plan—remain unchanged.[37] No new facts have been presented in the summary judgment record that would alter the materiality analysis with regard to that particular disclosure.[38]

10. The Motions as to Count II are **DENIED**.

11. The connection between Count II (the disclosure claims) and Count III (the claims relating to the 2010 Plan) is not terribly easy to follow. While Plaintiffs maintain (without support) that the Board was required to submit the 2010 Plan to

---

[37] I note that the Court's reliance upon *Ebix I* is not an application of the law of the case doctrine in its true sense. I recognize that *Ebix I* was confined to a review of the then-operative complaint. And I am mindful that "the determination of materiality is a mixed question of fact and law that generally can not [sic] be resolved on the pleadings. . . . At the very least, this issue must be developed factually before the materiality of the omitted information may be assessed properly." *O'Malley v. Boris*, 742 A.2d 845, 850–51 (Del. 1999). Even so, after considering the factual record, I am satisfied that the facts pled and considered in *Ebix I* have not changed.

[38] *See, e.g.*, *Weigand v. Berry Petr. Co.*, 1991 WL 45361, at *10 (Del. Ch. Mar. 27, 1991) (denying summary judgment upon holding that factual issues regarding plaintiff's disclosure claim remained for trial and noting that the court's resolution of the disclosure claim would impact its resolution of plaintiff's underlying claim regarding a merger). I also find the allegation relating to the timing of the adoption of the ABA presents a triable disclosure claim to the extent the timing of adoption relates to the Base Price disclosure. Finally, I find genuine issues of fact remain as to the materiality of the omission in the 2010 Proxy Statement regarding the unwritten terms that the Director Defendants allegedly added to the ABA after its adoption. A reasonable stockholder voting on a compensation plan that could lead to additional compensation for directors, officers, and most importantly Raina, might find it important to know the particular terms of the bonus to which Raina was already entitled under the ABA. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 372 (Del. 1993); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944–45 (Del. 1985).

11

the stockholders for approval,[39] that requirement does not exist in Delaware law.[40] Nevertheless, because Ebix's Board owed a duty to disclose fully and fairly all material information when it elected to seek stockholder approval of the 2010 Plan, the Court in *Ebix I* held that Plaintiffs had alleged sufficient facts to state a viable disclosure claim.[41] The Court also found, however, that the claim stated only a breach of the duty of care, not a breach of the duty of loyalty.[42] What remains of

---

[39] *See* FAC ¶ 92 & n.2 (citing 2010 Proxy Statement, which states "the Code"—defined as the Internal Revenue Code—requires approval of the plan, in support of the proposition that Delaware law requires the vote); Pls.' Answering Br. 99 ("Because stockholder approval was a condition for implementation of the 2010 Plan and no valid approval was obtained, the Board's distribution of options and restricted shares under the 2010 Plan was not authorized.").

[40] *See* FAC ¶ 265 ("The 2010 Proxy Statement acknowledged that stockholder approval of the 2010 Plan was required by NASDAQ rules."); Indep. Directors' Opening Br. in Supp. of Their Mot. for Summ. J. 38 ("Delaware law does not require a stockholder vote on plans such as the 2010 Plan. Instead, NASDAQ rules do."); Day Aff., Ex. 94 (2010 Proxy Statement) at 14 ("The [Internal Revenue Code] requires approval of the 2010 Stock Incentive Plan to permit options granted to qualify as incentive stock options to the extent so designed.").

[41] *Ebix I*, 2014 WL 3696655, at *28; *see also Malone v. Brincat*, 722 A.2d 5, 12 (Del. Ch. 1998) (holding that directors owe fiduciary duties of care and loyalty when they disseminate information to stockholders even when stockholder approval is not sought or required).

[42] *Ebix I*, 2014 WL 3696655, at *28 ("The Plaintiffs failed to plead that, other than possibly Raina, any member of the Board who approved the 2010 Proxy Statement was interested, not independent, or not acting in good faith by failing to disclose the correct ABA Base Price. It is not reasonably conceivable that the five Outside Directors stood on both sides of the ABA or that the ABA either provided them with a material benefit or caused them to suffer a material detriment. It is likewise not reasonably conceivable that the Outside Directors were beholden to another's interest or that Raina knew about the inaccuracy and failed to disclose that information to the Outside Directors. Finally, it is not reasonably conceivable that the Outside Directors failed to act in good faith by, for instance, knowingly disclosing an incorrect ABA Base Price. The basic premise underlying the

12

Count II, therefore, is a claim that the Ebix Defendants breached their duty of care in seeking stockholder approval of the 2010 Plan.

12. Count III alleges the Director Defendants "breached their fiduciary duties by granting incentive compensation to themselves under the invalid 2010 Plan and incentive compensation to others under the invalid 2010 Plan . . . ."[43]

13. I confess that I have struggled to discern exactly what claim Plaintiffs seek to prosecute in Count III, particularly given that only a duty of care claim has survived in Count II.[44] Plaintiffs argue that entire fairness applies to the grants of incentive compensation under "the invalid 2010 Plan" because the grants were self-interested transactions that were not ratified by a valid stockholder vote.[45] At oral argument, Plaintiffs explained that they are not challenging the amounts granted as

_____

Plaintiffs' theory here is precisely the opposite: the Board did not know about this potential issue with the ABA Base Price—at least not before this lawsuit. Because the 2010 Proxy Statement disclosure violations do not implicate loyalty or bad faith, the Court may apply Ebix's Section 102(b)(7) charter provision. Therefore, the Board is exculpated for monetary damages for this disclosure claim, but the possibility of awarding the requested declaratory and equitable relief remains.").

[43] FAC ¶ 269.

[44] The legal or factual bases for the contention that the 2010 Plan is "invalid" are not clear to me. As noted, Delaware law does not require a stockholder vote on the 2010 Plan but, apparently, NASDAQ rules do. FAC ¶ 265. The FAC does not appear to seek a declaration of invalidity based on a violation of NASDAQ rules.

[45] FAC ¶¶ 269–70; Tr. 144:3–7 ("[W]ith respect to Count III, receipt of compensation under that invalid plan, as we alleged, that was a loyalty claim, that was self-dealing. So we don't have to -- so that's already subject to entire fairness.").

13

somehow excessive or "not customary" on their face, but rather seek to prove that the awards "are not so customary when [defendants] know that the proxy statement that was used to solicit approval for that plan was not true. When [defendants] know, based on their knowledge, that the proxy statement that was used to solicit approval for that plan was no good, for them to say, 'Well, I got my 6,000 shares. No harm, no foul' – that's the problem . . . . They can't do that."[46] As noted, however, in *Ebix I*, the Court determined that Plaintiffs had not well-pled a breach of the duty of loyalty with regard to the 2010 Proxy Statement and, in that regard, expressly held that Plaintiffs had not well-pled that the Outside Directors intentionally misled stockholders.[47]

14. Given this procedural history, the only claim I can see that is left to try related to Count III is that, at some point following the adoption of the 2010 Plan, the Director Defendants became aware that the stockholder vote approving the 2010 Plan was uninformed but, nevertheless, continued to grant themselves awards under that Plan. Since Plaintiffs allege that all Director Defendants have received grants under the Plan in the years following its adoption, I understand Plaintiffs to challenge the validity of each of those grants.[48] In this respect, I understand Plaintiffs'

---

[46] Tr. 194:11–21.

[47] *Ebix I*, 2014 WL 3696655, at *28.

[48] *See* FAC ¶ 11.

14

argument to be that, similar to the scenario in *Kahn v. Tremont Corp.*, the process here was so unfair, and the "price" was so intertwined with process, that the awards should be rescinded, or disgorgement should be ordered, even if the Court determines that the awards themselves fell within a range of reasonableness.[49] While it is unclear to me on this record whether this claim can be supported factually or legally, I am satisfied at this stage of the proceedings that it is desirable "to inquire [more] thoroughly into [the facts] in order to clarify the application of the law to the circumstances."[50] Accordingly, summary judgment as to Count III is **DENIED**.[51]

---

[49] *See Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("Arguably, as the Chancellor found, the resulting price might be deemed to be at the lowest level in a broad range of fairness. But this does not satisfy the *Weinberger* test. Although often applied as a bifurcated or disjunctive test, the concept of entire fairness requires the court to examine all aspects of the transaction in an effort to determine whether the deal was entirely fair. When assigned the burden of persuasion, this test obligates the directors, or their surrogates, to present evidence which demonstrates that the cumulative manner by which it discharged all of its fiduciary duties produced a fair transaction." (internal citations omitted)); *see also Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012) ("[T]he process by which the Merger was negotiated and approved was not fair and did not result in the payment of a fair price. Because the issues relating to fair dealing and fair price were so intertwined, the [court] . . . treated them together in an integrated examination. That approach is consistent with the inherent non-bifurcated nature of the entire fairness standard of review.").

[50] *Ebersole v. Lowengrub*, 180 A.2d 467, 468–69 (Del. 1962).

[51] It is also unclear whether Plaintiffs are requesting rescission, cancellation or disgorgement with regard to awards made to non-director officers and employees. *See, e.g.*, FAC, intro. ("grants under the plan to all **members of the Board** are invalid" (emphasis supplied)); Pls.' Answering Br. 98 ("seek rescission of the shares and options ***Defendants*** have received under the 2010 Plan" (emphasis supplied)); Tr. 146:3–5 ("We're not talking about disgorgement from individual employees, nondefendants, nondirectors."). *But see* Tr. 145:6–16 ("THE COURT: So any awards under the 2010 plan made to employees, under your theory, they are canceled too? MR. FIORAVANTI: The

15. Having parsed through the FAC, the parties' briefing and the transcript of the May 23 hearing on the Motions, I see the trial of Counts II and III playing out in one of two ways: (1) if Plaintiffs fail to prove that the alleged omitted or misleading disclosures were material, then the stockholder vote approving the 2010 Plan was informed, the Plan was ratified and the business judgment rule will be the applicable standard (given that Plaintiffs do not challenge the amounts of the awards)[52]; or (2) if Plaintiffs succeed in proving that the 2010 Proxy Statement was materially misleading or omitted material facts, then the stockholder vote will be deemed uninformed, the 2010 Plan was not ratified, entire fairness will be the standard of review with respect to the Director Defendants' self-interested

---

Court could do that after trial, could -- THE COURT: I mean, is that the remedy you are asking for? MR. FIORAVANTI: We believe that the plan is invalid. What the company does afterwards, yes. But the Court, obviously, could award lesser relief."). Equitable relief of the kind requested, affecting the rights of individuals not party to this action that were not involved in the grants in any way, would present significant hurdles to Plaintiffs. *See, e.g.*, *Elster v. Am. Airlines*, 106 A.2d 202, 504 (Del. Ch. 1954) (finding optionees indispensible parties to a suit seeking to cancel options). And I see no basis in this record to provide such relief.

[52] *See In re 3COM Corp. S'holders Litig.*, 1999 WL 1009210, at *3 (Del. Ch. Oct. 25, 1999) ("Directors' decisions administering a shareholder approved Plan consistently with that Plan are entitled to the protection of the business judgment rule."); *In re Investors Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1212 (Del. 2017) (finding stockholder ratification defense not available because "plaintiffs alleged facts leading to a pleading stage reasonable inference that directors breached their fiduciary duties by awarding excessive equity awards").

16

compensation grants, and the Director Defendants will bear the burden of proving the fairness of the awards granted under the 2010 Plan.

**The 2014 Bylaw Amendments—Counts IV and V**

16. Count IV challenges the 2014 Bylaw Amendments as unreasonable anti-takeover devices adopted in breach of the Ebix Defendants' fiduciary duties.

17. Generally, the business judgment presumption protects decisions by a board of directors as long as they can be "attributed to any rational business purpose." [53] "Enhanced judicial scrutiny under *Unocal* applies[, however,] 'whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches on issues of control.'"[54]

18. In *Ebix II*, the Court denied a motion to dismiss Count IV and noted that the then-operative complaint stated that "Barington had 'announced a proxy contest'" and "characterize[d] Barington's actions—albeit in conclusory fashion—

---

[53] *Cede*, 634 A.2d at 360 ("The rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be attributed to any rational business purpose." (internal quotation omitted)).

[54] *Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009) (quoting *Santa Fe Pac. Corp., S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995)); *Unocal v. Mesa Petr. Co.*, 493 A.2d 946 (Del. 1985).

as amounting to a 'threat to [the Board's] control of Ebix.'"[55] The Court concluded, "[t]hese allegations, viewed in a light most favorable to Plaintiffs, permit a logical inference that Barington planned to win majority control of Ebix's Board by replacing incumbents with independent nominees."[56]

19. *Ebix II* also determined that *Unocal* would apply to Count IV as pled because the complaint "permit[ted] the inference that the Bylaw Amendments were, in the aggregate, a forward-looking prophylactic designed with Barington in mind, but holstered until the period of Barington's guaranteed complacency expired."[57] The Court referenced three factors in support of its finding: (1) the 2014 Bylaw Amendments were prepared shortly after Barington's "intent to launch a proxy contest"; (2) Barington contractually was barred from running a slate of alternative directors for, at most, two years; and (3) while "most of the Bylaw Amendments achieved little more than making stockholder action more cumbersome," "the Special Meeting Bylaw's series of clauses [] allow[ed] the Board, at the very least, to delay stockholder-initiated special meetings for 120 days and, at most, prevent elections from occurring at special meetings indefinitely"—and "Bylaw

---

[55] *Ebix II*, 2016 WL 208402, at *5 n.41.

[56] *Id.*

[57] *Id.* at *19.

amendments enacting shorter special meeting delay periods have received *Unocal* scrutiny in past cases."[58]

20. The undisputed record now demonstrates: (1) Barington did not intend to launch a proxy contest but instead intended to add directors to the Board, which it achieved prior to the adoption of the 2014 Bylaw Amendments[59]; and (2) the Board did not adopt the 2014 Bylaw Amendments in response to any present or future threat by Barington.[60]

---

[58] *Id.*

[59] Day Aff., Ex. 109 (Nov. 11, 2014 Press Release) ("Barington is convinced that the addition of new independent directors to the Ebix Board is a necessary first step to remove the overhang weighing on the Company's stock price . . . ."); Day Aff., Ex. 110 (Nov. 11, 2014 Ltr. from Barington to Raina-Attachment to Press Release) at 8 ("We believe that adding new, truly independent directors to the Ebix Board is necessary . . . ."); *id.* at 9 ("We are convinced that the addition of new independent directors to the Board is a necessary first step . . . .").

[60] Bhalla Dep. 145:5–17, D.I. 422 ("Q. As a director, were you concerned that Barrington [sic] Capital presented a threat to corporate control? . . . THE WITNESS: I don't remember feeling threatened personally. No, I don't remember feeling threatened, because I'm elected to the board every year. Q. (By Mr. Fioravanti) And that's the reason why you didn't feel threatened? A. Yeah. If I don't get elected, I get off the board. I have no concerns."); Keller Dep. 142:19–143:11, D.I. 270 ("Q. What was the impetus for changing the company's by-laws? . . . What was the thing that happened that, sort of, spurred the decision to change the company's by-laws? A. I do not recall precisely. We had this discussion and in the same time, if I remember correct, Barington approached us. And what we wanted to make sure is that someone would -- if someone would want to join the board, that the company would have at least several rights to know who it was, same as the existing board members. So to ensure an orderly process, kind of. Q. So it was -- A. But I do not recall whether Barington was the incident who started this discussion or the discussion started already earlier."); Eckert Dep. 140:3–7, D.I. 281 ("I speculate [the 2014 Bylaw Amendments] may have been at the time that we were looking at the appointments of two new directors for which in the end I think a decision was taken to sort out the rules and clean things up.").

21. The Ebix Defendants' decision to adopt the 2014 Bylaw Amendments is subject to the business judgment presumption,[61] and Plaintiffs have failed to rebut that presumption.[62] Summary judgment as to Count IV is **GRANTED**.

22. Count V challenges the adoption of the 2014 Bylaw Amendments, claiming they were not approved by the Board because "there are no minutes of any meeting, no unanimous written consent or any other document evidencing Board approval of the [] Bylaws."[63]

23. Under Section 8.5 of Ebix's bylaws, any bylaw "may be rescinded, altered, amended or repealed, and new Bylaws may be made [] by the Board, by vote of a majority of the number of directors then in office as directors, acting at any meeting of the Board."[64]

---

[61] *See Gantler*, 965 A.2d at 705 (finding the business judgment standard applied because defendants did not act defensively and did not, therefore, trigger *Unocal*).

[62] *Wis. Inv. Bd. v. Bartlett*, 2000 WL 238026, at *4 (Del. Ch. Feb. 24, 2000) ("[A] breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with care, loyalty, and in 'good faith.' Unless this presumption is sufficiently rebutted, raising a reasonable doubt about self-interest or independence, the Court must defer to the discretion of the board and acknowledge that their decisions are entitled to the protection of the business judgment rule.").

[63] FAC ¶¶ 276–77.

[64] Transmittal Aff. of Veronica B. Bartholomew in Supp. of the Indep. Directors' Opening Br. in Supp. of their Mot. for Summ. J. ("Bartholomew Aff."), Ex. 3 (Mar. 1, 2018 Ebix Form 10-K) at Ex. 3.1 (Amended and Restated Bylaws of Ebix, Inc. a Delaware Corporation) § 8.5.

24. Plaintiffs are correct that there are no official board minutes, no written consents or other contemporaneous official documents evidencing the Board's approval of the 2014 Bylaw Amendments.

25. "[W]here corporate bylaws give the appearance on the records of the corporation as having been adopted by those with the authority to do so, where they are regularly maintained in the records of the corporation thereafter and where they are relied upon in dealings with others as being the bylaws of the corporation, there arises a rebuttable presumption that they were regularly and properly adopted."[65] "The party asserting that bylaws were not properly adopted bears the burden to prove it."[66]

26. There is no dispute that the 2014 Bylaw Amendments were disclosed to stockholders as adopted in 2014 and that the Board has since treated them as Ebix's official bylaws. Beyond the absence of minutes or written consents, Plaintiffs have failed to prove that the 2014 Bylaw Amendments were not adopted by the Board. On the other hand, the record contains an email sent by Benz to himself on December 19, 2014 at 5:44 p.m., that attaches a picture of handwritten notes labelled

---

[65] *Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 386 (Del. Ch. 1984).

[66] *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 949 (Del. Ch. 2013) (internal quotation omitted).

"BOD call."[67]  Those notes reflect that attorneys and certain directors participated in a teleconference on December 19, 2014, at 5:00 p.m. (11:00 a.m. EST), that four bylaws were presented during that call by way of a "Motion," and that those bylaws were unanimously approved (by those directors on the call).[68]  This board call was planned by way of several email chains leading up to December 19.[69]  One of those emails, an email sent by Raina to the Board on December 17, 2014, contains, *inter alia*, an attachment titled "Ebix-Bylaws-cumulative Redline.pdf."[70]  In the text of the email, Raina reminded the directors of the board call scheduled for December 19.[71]  In another email from Raina, sent on December 22, 2014 to Robert Kerris, Ebix's secretary, Raina states, "all this is now approved by the Board[;] 8-K is being filed by Skadden on the 23rd/24th."[72]  The email again attaches the document titled "Ebix-Bylaws-cumulative Redline.pdf."[73]  And Ebix's December 24, 2014

---

[67] Bartholomew Aff., Ex. 36 (Benz email with handwritten notes, Dec. 19, 2014).  Benz resides in Switzerland.  FAC ¶ 26.  His emails would note a time presumptively six hours ahead of EST.

[68] Bartholomew Aff., Ex. 36 (Benz email with handwritten notes, Dec. 19, 2014).

[69] Bartholomew Aff., Exs. 33 (Herter email, Dec. 17, 2014), 34 (Raina email, Dec. 17, 2014), 35 (email to Raina, Keller, Benz, Bhalla, Eckert, Dec. 17, 2014).

[70] Bartholomew Aff., Ex. 34 (Raina email, Dec. 17, 2014).

[71] *Id.*

[72] Bartholomew Aff., Ex. 37 (Raina email, Dec. 22, 2014).

[73] *Id.*

Form 8-K discloses that the Board approved the 2014 Bylaw Amendments on December 19, 2014.[74]

27.    None of the deposition testimony cited by Plaintiffs overcomes the presumption of validity in light of the clear evidence of adoption.[75]  The testimony simply shows that, years after the "Board call," several directors do not recall the call or the approval of the 2014 Bylaw Amendments.  Such failure to remember, however, does not "place in dispute" the approval of the 2014 Bylaw Amendments.[76]

---

[74] Day Aff., Ex. 115 (Dec. 24, 2014 Ebix Form 8-K), Item 5.03.

[75] Keller Dep. 142:9–14 ("Q. I would like to take you forward in time now to 2014. I'm wondering if you recall that in 2014 the company, the board, determined to amend the company's by-laws.  Do you recall that event?  A.  Uh-huh."); Herter Dep. 138:7–11 ("Q. No, I'm not asking you if you recall the agreement.  I'm asking you if you recall taking action in 2014 to amend the bylaws of the company.  A.  I don't recall that, actually."); Keller Dep. 139:6–15 ("Q.  Do you know if the board of directors signed any resolutions approving bylaw amendments in December of 2014?  A.  I can't recall. Q.  Do you recall having a meeting to discuss bylaw amendments in December of 2014? A.  I can speculate, but I don't want to speculate.  So I think I know what -- some of what's going on, but you're asking me whether I can specifically recall and I don't think I can."); Bhalla Dep. 143:10–144:7 ("A.  This is some changes to our articles of incorporation, bylaws.  Q.  Now, if you turn to page 2 of Exhibit 24, did the board approve these amendments to the bylaws?  A.  That's what it says.  I assume it did.  Q.  Do you have any independent recollection of whether the board approved these bylaws?  A.  I don't remember.  Q.  Do you know whether the board -- do you recall ever signing unanimous written consent of the board approving these bylaws?  A.  I don't remember, but it should be documented if I did.  Q.  And if these bylaws were approved at a meeting of the board, it would have been documented at a board meeting; right? . . . THE WITNESS: I assume so.  Q.  (By Mr. Fioravanti) Okay.  Have you seen minutes of any board meeting reflecting approval of these bylaw amendments?  A.  I don't remember.").

[76] *See, e.g.*, *Hideout Records & Distribs. v. El Jay Dee, Inc.*, 601 F.Supp. 1048, 1053 (D. Del. 1984) ("Mrs. Nelkin's statement that she cannot remember hearing the songs played does not place in dispute the statements of Hood and Verna that the songs were in

28. Summary judgment as to Count V is **GRANTED**.

## The 2016 Proxy Disclosures and the 2016 CEO Bonus Plan—Count IX

29. Count IX alleges

> Ebix and the [Director] Defendants issued [a] false and materially misleading and incomplete 2016 Proxy Statement that contained material misstatements regarding the ABA and Base Price, including that (i) it had been validly approved by the Board; (ii) the Base Price was $7.95; (iii) the so-called independent directors had agreed on the desirability of that type of agreement on March 25, 2009; and (iv) the calculation of the ABA payout to Raina upon an acquisition event having occurred on December 31, 2015 was false.[77]

It further alleges the 2016 Proxy Statement failed to include an accurate description of the ABA's terms—including additional unwritten terms claimed to be part of the agreement.[78]

30. Plaintiffs contend that the materially misleading or omitted information regarding the ABA in the 2016 Proxy Statement prevented stockholders from validly approving the 2016 CEO Bonus Plan.[79] Because the 2016 CEO Bonus Plan was not ratified by stockholders, Plaintiffs submit, "any bonus paid to Raina . . . should be

---

fact played since an affiant's failure to remember an event is not a specific denial that the event occurred.").

[77] FAC ¶ 313.

[78] FAC ¶ 314; Pls.' Answering Br. 63.

[79] FAC ¶ 314.

rescinded and cancelled and the Director Defendants should be enjoined from making any further payments to Raina under the 2016 CEO Bonus Plan."[80]

31. "Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote."[81] "To state a claim for false statement, 'a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false.'"[82] "Material facts are those facts for which there is a substantial likelihood that a reasonable person would consider them important in deciding how to vote."[83]

32. After considering the record, I am satisfied that only one of Count IX's alleged false or misleading disclosures is triable. Before addressing that claim, I address briefly the claims that fail as a matter of undisputed fact and as a matter of law.

33. First, the Board still maintains the ABA was valid and properly adopted. As a matter of Delaware law, the Board was not required to question or cast doubt

---

[80] *Id.*

[81] *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992).

[82] *Shaev v. Adkerson*, 2015 WL 5882942, at *9 (Del. Ch. Oct. 5, 2015) (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 920 (Del. Ch. 1999)).

[83] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation omitted).

on the ABA's validity and proper adoption in the 2016 Proxy Statement (or otherwise). Stated differently, a corporate board need not "engage in 'self-flagellation'" to satisfy "its fiduciary duty to disclose all relevant material facts [when requesting stockholder action] . . . ."[84] For that reason, the Board's statement in the 2016 Proxy Statement regarding the validity and proper adoption of the ABA is not a "material misstatement" within the contemplation of our corporation law.

34. Second, while the 2016 Proxy Statement stated the Base Price as $7.95, it also stated that this price was "post-stock split" and that "prior to the three-for-one split that occurred on January 4, 2010, this value was $23.84."[85] This disclosure stands in contrast to the disclosure in the 2010 Proxy Statement. The 2016 disclosure described the relationship between the Base Price and the stock split; the 2010 disclosure did not.

35. Third, the disclosure of the exact time in 2009 when the directors decided the ABA was desirable and should be adopted would not alter the total mix of information available to Ebix stockholders, nor would it be important to them in deciding how to vote on CEO bonus compensation. Unlike the timing of adoption issues relating to the 2010 disclosures, where the claimed false disclosures on timing

---

[84] *Stroud*, 606 A.2d at 84 n.1.

[85] Day Aff., Ex. 121 (2016 Proxy Statement) at 34–35.

allegedly masked the true Base Price, the disclosures relating to the Base Price in the 2016 disclosure, as noted above, were not materially misleading.

36. Finally, the disclosure of erroneous—overstated—*hypothetical* bonus calculations does not give rise to a viable disclosure claim. The Board's failure to disclose a calculation of a hypothetical payout to Raina that was *more* favorable to Ebix and its stockholders would *not* "have assumed actual significance in the deliberations of the reasonable shareholder"[86] when deciding whether to approve the plan.[87]

37. As for the failure to disclose the alleged additional, unwritten terms of the ABA, there is a triable dispute of fact as to whether a reasonable stockholder considering a grant of additional compensation to Raina would have found it material to know the terms of the ABA, including any unwritten terms that would increase the compensation due to Raina under the ABA. Summary judgment as to Count IX, therefore, is **GRANTED** in part and **DENIED** in part.[88]

---

[86] *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[87] *Cf. Shaev*, 2015 WL 5882942, at *10 ("Even assuming Freeport stockholders would consider such information to be material, however, the Court is unwilling to find a disclosure violation where the board *understates* its diligence, yet the transaction is nonetheless approved by stockholders." (emphasis in original)).

[88] I grant summary judgment on Count IX in its entirety as to Ebix because Ebix does not owe fiduciary duties to the Plaintiffs. *See Arnold*, 678 A.2d at 539 (explaining a

**The Barington Defendants—Counts III and IX**

38.  The Barington Defendants seek summary judgment as to Count III because: (1) they were not members of the Board when the 2010 Plan was adopted; (2) they are disinterested and Plaintiffs present no evidence that their compensation was not customary or reasonable; and (3) Plaintiffs failed to plead demand futility as to Count III.

39.  In *Ebix I*, the Court determined that demand was excused as to Count III.[89] This is the law of the case.[90]

40.  While the Barington Defendants were not members of the Board at the time the 2010 Plan was adopted and cannot, on this record, be held personally liable for that decision,[91] they have since received compensation under the plan. As noted,

---

corporation does not owe fiduciary duties and cannot be held directly liable for a breach of the duty of disclosure).

[89] *Ebix I*, 2014 WL 3696655, at *22–23.

[90] *May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2003) ("The 'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation, and 'once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.'" (quoting *Odyssey P'rs v. Fleming Co.*, 1998 WL 155543, at *1 (Del. Ch. Mar. 27, 1998))).

[91] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 758 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ("Delaware law does not require directors-to-be to comply with their fiduciary duties."); *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995) ("That being so, those directors' absence from the meeting, and their abstention from voting to approve the Combination, does, in my view, have dispositive significance, and shields these defendants from liability on any claims predicated upon the board's decision to approve that transaction."). *Cf. Valeant Pharm. Int'l v. Jerney*, 921

Plaintiffs' theory in Count III is that the Director Defendants became aware that the stockholder vote approving the 2010 Plan was not informed, and that they nevertheless continued to grant themselves awards under the plan. That claim, if proven in a manner that is actionable under Delaware law, may well implicate the Barington Defendants. In any event, since part of the relief requested with regard to Count III is the disgorgement of any grants received by the Director Defendants under the 2010 Plan,[92] dismissal of the Barington Defendants would prevent full relief as to Count III.[93] Accordingly, the Barington Defendants' motion for summary judgment as to Count III must be **DENIED**.

---

A.2d 732, 753 (Del. Ch. 2007) ("Generally speaking, a director who does not attend or participate in the board's deliberations or approval of a proposal will not be held liable." (internal citations omitted)).

[92] Count III has been characterized by the Court in *Ebix I* as a breach of the duty of loyalty and one of the remedies sought is disgorgement. *Ebix I*, 2014 WL 3696655, at *29. Section 102(b)(7) does not apply under these circumstances. *Id.*

[93] *See, e.g.*, *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307440, at *2 (Del. Ch. May 15, 1996) (in response to individual defendants moving for dismissal of a count against them in their individual capacities, and the plaintiff arguing that it would seek relief that would affect those directors even if dismissed, the court held "[t]o the extent that the individual directors are joined in their official capacities solely to afford complete relief should Moore prevail on its claim against Cordant, the directors may remain in the case as named defendants for that limited purpose"); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *11 (Del. Ch. May 5, 2010) (dismissing four counts as to three individual directors because they cannot be held personally liable and were "not indispensable parties because a final decree could be made without affecting their personal interests," but declining to dismiss individual directors who had already received funds from their respective employment agreements and were, thus, indispensable parties). I note that disgorgement of profits received by an innocent party can be appropriate "upon a showing that [] ill-gotten gains were transferred to the innocent party." *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *27 n.166 (Del. Ch. May 18, 2009); *see also*

29

41. The Barington Defendants seek summary judgment on Count IX, claiming they "had a statutory right to rely upon Ebix's public filings *prior to [their] joining the Board*, as well as the information contained therein."[94]

42. The Barington Defendants joined the Board in 2015, well after the adoption of the ABA.[95] They were members of the Board in 2016, however, when the Board made the disclosures at issue in Count IX.

43. Under 8 *Del. C.* § 141(e), the Barington Defendants were entitled to rely in good faith on Ebix's corporate records as well as on the assurances, express and implied, of their fellow directors.[96] Plaintiffs have failed to present any evidence

---

*In re Tyson Foods, Inc.*, 919 A.2d 563, 602 (Del. Ch. 2007) ("A defendant may be liable 'even when the defendant retaining the benefit is not a wrongdoer' and 'even though he may have received [it] honestly in the first instance.'" (quoting *Schock v. Nash*, 732 A.2d 217, 232–33 (Del. 1999)) (alteration in original)).

[94] Opening Br. of Defs.' Joseph R. Wright, Jr. and George W. Hebard III in Supp. of Their Mot. for Summ. J. 42 (emphasis added).

[95] *See* Answer to Verified Fourth Am. and Supplemented Class Action and Deriv. Compl. of Defs.' Joseph R. Wright, Jr. and George W. Hebard III ¶ 174.

[96] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) ("[Section 141](e) has been amended to clarify that directors may rely in good faith upon all corporate records, reports of employees and committees of the board and the written or oral advice or opinions of any professionals and experts who are selected with reasonable care and are reasonably believed to be acting within the scope of their expertise." (internal quotation omitted)); *Walt Disney*, 906 A.2d at 60 ("[Section 141(e)] is to protect directors who rely in good faith upon information presented to them from various sources, including 'any other person as to matters the member reasonably believes are within such person's professional or expert competence and who has been selected with reasonable care by and on behalf of the corporation.'" (quoting 8 *Del. C.* § 141(e))).

that the Barington Defendants did not rely in good faith on the fact that their fellow directors had accurately disclosed the terms of the ABA in past disclosures and were doing so again in the 2016 Proxy Statement.[97]

44.   Summary judgment as to Count IX is **GRANTED** with regard to the Barington Defendants.

### CONCLUSION

Summary judgment as to all defendants on Counts I, IV, V, VI, VII and X is **GRANTED**.   Summary judgment as to all defendants other than Ebix and the Barington Defendants on Count IX is **GRANTED in part and DENIED in part**. Summary judgment as to Ebix and the Barington Defendants on Count IX is **GRANTED.**   Summary judgment as to Counts II (Ebix Defendants) and III (Director Defendants) is **DENIED**.

**IT IS SO ORDERED.**

*/s/ Joseph R. Slights III*
Vice Chancellor

---

[97] As previously noted, the remaining board members continue to maintain that the ABA was (prior to its termination) a valid contract.  And the terms of the ABA were disclosed consistently, since 2009, in Ebix's annual proxy statements as a contract between Ebix and Raina.  *See* Day Aff., Ex. 94 (2010 Proxy Statement) at 26; *id.* at Ex. 95 (2011 Proxy Statement) at 27; *id.* at Ex. 97 (2012 Proxy Statement) at 27; *id.* at Ex. 104 (2013 Proxy Statement) at 27; *id.* at Ex. 113 (2014 Proxy Statement) at 26.